# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| STATE OF MARYLAND<br>200 Saint Paul Pl<br>Baltimore, MD 21202<br><br>       Plaintiff<br><br>       v.<br><br>TODD M. LYONS, Senior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement,<br>500 12th St., SW<br>Washington, D.C. 20536<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT,<br>500 12th St., SW<br>Washington, D.C. 20536<br><br>KRISTI NOEM, Secretary, U.S. Department of Homeland Security,<br>2707 Martin Luther King Jr. Ave. SE<br>Washington, D.C. 20528<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br>2707 Martin Luther King Jr. Ave. SE<br>Washington, D.C. 20528<br><br>       Defendants. | Civ. No. |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      For more than a year, the conditions at the rooms used to hold immigration detainees in the George H. Fallon Federal Building in Baltimore, Maryland have been the subject of concern by members of Congress, reported by the news media, and the subject of litigation. Despite this attention, reports of crowded and dangerous conditions grew worse, rather than better, with reports of detainees being denied critical medical care for serious chronic conditions such as diabetes, renal failure, and heart conditions; scores of detainees kept in rooms not designed for detention for days that are so crowded that not all detainees can lie down to sleep at night; the absence of bedding or blankets with room temperatures kept extremely cold; inadequate quantities of food or food that is inedible; a single toilet with little privacy for 40 or 50 people; and limited ability to talk to counsel or communicate with the outside world. While these rooms were designed for detention of up to twelve hours, people are confined for up to ten days or longer. Detainees commonly complain that they are treated like "animals" and denied their humanity.

2.      In response to these allegations—and the release of a disturbing video showing conditions in the hold rooms in which detainees claimed to have been held for ten days, assaulted, and denied food and proper hygiene—the Office of the Attorney General (OAG) opened an investigation in January 2026 into whether ICE's conduct violated federal civil rights laws and other federal laws such as the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 et seq. That investigation is being jointly undertaken by OAG's Civil Rights Division and Federal Accountability Unit and remains ongoing.

3.      As part of its civil rights investigation, OAG subpoenaed Defendants to produce documents and official records in accordance with Department of Homeland Security (DHS) regulations.  Notwithstanding OAG's detailed explanation of the need for this information, ICE

refused to comply with the subpoena, relying on boilerplate objections that the requested material is burdensome, overbroad, or irrelevant, or that the requests implicate privacy protections.

4.    Defendants' refusal to comply with the subpoena violates their own regulations and is unreasonable, arbitrary, and capricious.  It also impedes Maryland's ability to conduct its civil rights investigation and protect the well-being of its residents and the State.

5.    Because Defendants' failure to comply with the subpoena is contrary to law and arbitrary and capricious in violation of the Administrative Procedure Act (APA), Maryland asks this Court to declare that ICE's denial of OAG's subpoena was arbitrary and capricious, 5 U.S.C. § 706(2)(A); vacate and set aside ICE's decision; and order DHS and ICE to produce the documents requested.

**JURISDICTION AND VENUE**

6.    Jurisdiction in this Court is proper under 28 U.S.C. §§ 1331 and 1361.

7.    Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because Plaintiff State of Maryland and its Attorney General reside in this District, and a substantial part of the acts or omissions giving rise to this action occurred in this District.

**PARTIES**

8.    Plaintiff State of Maryland is a sovereign state of the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Anthony G. Brown.

9.    Defendant Todd Lyons is the Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement.  He is sued in his official capacity.

10.    Defendant ICE is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).  ICE is a component and under the supervision of the Department of Homeland Security.

11.     Defendant Kristi Noem is the Secretary of Homeland Security and the head of the DHS.  She is sued in her official capacity.

12.     Defendant DHS is a department of the Executive Branch of the United States government.  DHS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

## LEGAL BACKGROUND

13.     Under 5 U.S.C. § 301, "commonly known as the 'Housekeeping Statute,' federal agencies are granted authority to prescribe regulations governing the agency, including regulations for 'the custody, use, and preservation of its records, papers, and property.'"  *United States v. Williams*, 170 F.3d.431, 433 (4th Cir. 1999) (quoting 5 U.S.C. § 301).  "Housekeeping regulations that create agency procedures for responding to subpoenas are often termed *Touhy* regulations," *COMSAT Corp. v. NSF*, 190 F.3d 269, 272 n.3 (4th Cir. 1999), after *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), in which the Supreme Court "recognized the validity of a Justice Department order . . . which restricted the disclosure of information pursuant to the Housekeeping Statute."  *Williams*, 170 F.3d at 433.  *Touhy* regulations "guide agency decisions pertaining to disclosures but do not [themselves] provide a substantive defense to disclosure."  *Maryland v. Smith*, 766 F. Supp. 3d 498, 501 n.1 (D. Md. 2025) (quoting *Gulluni v. Levy*, 85 F.4th 76, 82 (1st Cir. 2023)).

14.     DHS has promulgated *Touhy* regulations at 6 C.F.R. §§ 5.41–5.49.  These regulations establish procedures to be followed with respect to certain requests for document production, including those issued "pursuant to . . . applicable state rules."  6 C.F.R. § 5.41(a)(2).

15.     "If official information is sought . . . by a request or demand, the party seeking such release . . . must . . . set forth in writing, and with as much specificity as possible, the nature and relevance of the official information sought."  *Id.* § 5.45(a).

16.    "In deciding whether to comply with a demand or request, [DHS] officials and attorneys shall consider, among any other pertinent considerations," the following:

(1) Whether such compliance would be unduly burdensome or otherwise inappropriate under the applicable rules of discovery or the rules of procedure governing the case or matter in which the demand arose;

(2) Whether compliance is appropriate under the relevant substantive law concerning privilege or disclosure of information;

(3) The public interest;

(4) The need to conserve the time of [DHS] employees for the conduct of official business;

(5) The need to avoid spending the time and money of the United States for private purposes;

(6) The need to maintain impartiality between private litigants in cases where a substantial government interest is not implicated;

(7) Whether compliance would have an adverse effect on performance by [DHS] of its mission and duties; and

(8) The need to avoid involving [DHS] in controversial issues not related to its mission.

*Id.* § 5.48.

17.    "6 C.F.R. § 5.48(a) requires DHS to consider the enumerated factors, but also allows the consideration of additional factors." *RLI Ins. Co. v. Nexus Servs.*, No. 5:18-CV-00066, 2020 WL 1496466, at *3 n.5 (W.D. Va. Jan. 17, 2020).

18.    These regulations "apply to each component of [DHS]." 6 C.F.R. § 5.41(b). ICE is a component of DHS. 8 C.F.R. § 100.1.

19.    A federal agency cannot refuse to provide government information without a reasoned explanation. "There is no independent privilege to withhold government information or shield federal employees from valid subpoenas that arises from the [*Touhy*] regulations," *Smith*, 766 F. Supp. 3d at 510 n.16 (quoting *Lamb v. Wallace*, No. 16-cv-44, 2018 WL 847242, at *5

(E.D.N.C. Feb. 13, 2018)), and indeed, the Housekeeping Statute "expressly provides that it 'does not authorize withholding information from the public or limiting the availability of records to the public.'" *Lamb*, 2018 WL 847242, at *5 (quoting 5 U.S.C. § 301).

20.     Although sovereign immunity protects the federal government from being compelled to respond to a subpoena, the Administrative Procedure Act (APA) "waives the government's sovereign immunity from suit and permits federal court review of final agency actions." *COMSAT Corp.*, 190 F.3d at 274. Thus, "litigants who are dissatisfied with an agency's response to a third-party subpoena . . . may [ ] obtain federal court review under the APA." *Id.* at 278. "The APA . . . permits a federal court to order a non-party agency to comply with a subpoena if the government has refused production in an arbitrary, capricious, or otherwise unlawful manner." *Id.* at 277.

21.     To be sustained under the APA, "an agency's decision to not comply with a subpoena" must be "reasonable" and reached "in accordance with [its] *Touhy* regulations." *Andreas-Myers v. NASA*, No. GJH-16-3410, 2017 WL 1632410, at *7 (D. Md. Apr. 28, 2017) (collecting cases); *see also COMSAT*, 190 F.3d at 277; *Smith v. FBI*, No. CV 25-12-BAH, 2026 WL 91607, at *12 (D. Md. Jan. 13, 2026). The agency must "appropriately consider[ ] relevant factors, as outlined in its internal regulations, and provide[ ] a rational basis for its decision." *Andreas-Myers*, 2017 WL 1632410, at *8. Courts have deemed subpoena responses to violate the APA when the agency "did not properly consider and apply its own *Touhy* regulation factors," *Rhoads v. U.S. Dep't of Veterans Affs.*, 242 F. Supp. 3d 985, 995 (E.D. Cal. 2017), or when "the administrative record fails to demonstrate 'a rational connection between the facts found and the decision made.'" *Schroeder v. U.S. Dep't of Veterans Affs.*, 673 F. Supp. 3d 1204, 1220 (D. Kan. 2023) (quoting *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1197 (10th Cir. 2014));

see also *In re Subpoena to NSF OIG*, No. 3:18-MC-00006-JAG, 2018 WL 5017612, at *4 (E.D. Va. Oct. 16, 2018) (holding that agency "abused its discretion in refusing to comply with the movants' subpoena . . . because its decision 'failed to consider important aspects of the dispute, runs counter to the evidence presented, and misapplied [the agency's] *Touhy* regulations'") (quoting *Lamb*, 2018 WL 847242, at *6).

## FACTUAL ALLEGATIONS

### I.    OAG Investigation of ICE Hold Rooms in the Fallon Federal Building

22.    The Baltimore Field Office for ICE Enforcement and Removal Operations ("ERO") is located in the George H. Fallon Federal Building ("Fallon Federal Building") at 31 Hopkins Plaza, Baltimore, Maryland 21201.  The Fallon Federal Building houses office space for a number of federal agencies, including the Maryland Field Office of the Bureau of Alcohol, Tobacco, & Firearms, and the Baltimore Office of the Internal Revenue Service, as well as the Baltimore Immigration Court.

23.    In the Fallon Federal Building, ICE operates a Holding Facility, which is "a facility that contains hold rooms that are primarily used for the short-term confinement of individuals who have recently been detained, or are being transferred to or from a court, detention facility, other holding facility, or other agency."  ICE, ERO, Directive 11087.2, *Operations of ERO Holding Facilities* § 3.2 (2024), https://www.ice.gov/doclib/foia/policy/directive11087.2.pdf [https://perma.cc/Z5Q9-CDZT].

24.     ICE defines a "hold room" as a "holding cell, cell block, or other secure enclosure within a holding facility." *Id.* § 3.3.[1]  According to ICE, the Baltimore Holding Facility includes five "hold rooms" with a combined size of 1,728 square feet—the equivalent of a volleyball court. *See* Defs.' Suppl. Response to Interrogatories, *D.N.N.*, No. 1:25-cv-01613-JRR, ECF 127-9, at 5 (Dec. 23, 2025) (attached as Exhibit A).   ICE has stated that the Baltimore Field Office has a maximum detention capacity of 56 individuals.   Memorandum from Nikita Baker, Deputy Field Office Director, ERO Baltimore, to ICE Unit Chief, Detention Oversight Unit, Oversight, Compliance and Acquisition Division (Feb. 9, 2025), *D.N.N.*, No. 1:25-cv-01613-JRR, ECF 127-3, at 2 (D. Md. Dec. 23, 2025) (attached as Exhibit B) [hereinafter "Baker Mem."].

25.     ICE defines "short-term" as "a period not to exceed 12 hours, absent exceptional circumstances."[2]  ICE, ERO, Directive 11087.2, § 3.2 n.3.  These "hold rooms" are temporary holding rooms in a federal office building, and are not designed or equipped for sleeping, or to provide food, water, or medical care for extended periods of time.  The "hold rooms" do not have showers and each include only one public toilet.  The "hold rooms" are windowless.

---

[1] Plaintiff uses the term "hold room" to refer to formally designated "hold rooms," as well as any other similar temporary detention facility in the Fallon Federal Building used to detain individuals in ICE custody.

[2] On February 5, 2025, the Baltimore Field Office received a waiver to detain individuals for up to 48 hours.  *See* Memorandum from Nikita Baker, Deputy Field Office Director, ERO Baltimore, to Monica Burke, Assistant Director, Custody Management, to All ERO Field Office Directors (Jan. 30, 2025), *D.N.N. et al. v. Baker et al.*, No. 1:25-cv-01613-JRR, ECF 40-2, at 1 (D. Md. June 30, 2025) (attached as Exhibit C) [hereinafter "Baltimore Waiver Mem."].  On June 24, 2025, ERO issued a nationwide waiver to all ICE holding facilities to allow for noncitizens to be held for up to 72 hours, absent exceptional circumstances.  *See* Memorandum from Monica Burke, Assistant Director, Custody Management, to All ERO Field Office Directors (June 24, 2025), *D.N.N.*, No. 1:25-cv-01613-JRR, ECF 40-3, at 1 (D. Md. June 30, 2025) (attached as Exhibit D) [hereinafter "Nationwide Waiver Mem."].

26.     In late January 2026, OAG became aware of a video circulating online that shows numerous male individuals held in what appeared—and was later confirmed—to be the Baltimore hold rooms.  *See* John-John Williams IV et al., *Viral video provides rare look inside crowded ICE holding room in Baltimore*, Balt. Banner (Jan. 27, 2026, 5:30 AM), https://www.thebanner.com/politics-power/national-politics/viral-video-baltimore-ice-holding-room-immigrants-DWH3RIXO45CDRGZDZA4QPA3JNQ/ [https://perma.cc/67SD-N2BD].

27.     Individuals in the video say that they have been detained for ten days, assaulted, and denied food and proper hygiene.  Transcript of Video from the Baltimore Hold Room, *D.N.N.*, No. 1:25-cv-01613-JRR, ECF 129-1 (D. Md. Jan. 26, 2026) (attached as Exhibit E).

28.     Shortly after the publication of the video, OAG launched an investigation of potential civil rights violations and violations of other federal laws, e.g., the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 et seq., in connection with immigration detention by ICE in the Fallon Federal Building ("Hold Room Investigation").

29.     The Hold Room Investigation is conducted by OAG's Civil Rights Division and Federal Accountability Unit pursuant to Maryland laws that authorize the Attorney General to conduct investigations of potential civil rights violations and actions or inactions by the federal government that threaten the public interest and welfare of Maryland residents.  Md. Code Ann., State Gov't § 20-1041(a) ("The Attorney General may investigate, prosecute, and remediate, on behalf of the residents of the State, any conduct that constitutes a civil rights violation."); *id.* § 6-106.1(b)(1) ("[T]he Attorney General may investigate, commence, and prosecute or defend any civil or criminal suit or action that is based on the federal government's action or inaction that threatens the public interest and welfare of the residents of the State with respect to . . . (i) protecting the health of the residents of the State and ensuring the availability of affordable

healthcare; . . . (iii) protecting civil liberties; . . . (viii) protecting the residents of the State against illegal and unconstitutional federal immigration and travel restrictions; . . . or (xiii) otherwise protecting, as parens patriae, the State's interest in the general health and well-being of its residents."); *see also id.* § 20-1040(c)(1).

30.    OAG is investigating whether DHS and ICE are engaging in a pattern or practice of civil rights violations by subjecting noncitizens to conditions in the Baltimore hold rooms that include: overcrowding, extended duration of detention, failure to provide medical attention, failure to provide sufficient food and water, failure to provide an adequate sleep environment, failure to provide access to hygienic and sanitary conditions, and failure to provide access to legal counsel.

31.    To date, OAG has interviewed attorneys whose clients have been detained in the Baltimore hold rooms, reviewed publicly available information about the hold rooms, and analyzed relevant detention standards.  The investigation is ongoing.

32.    During the course of the Hold Room Investigation, OAG has learned of new, disturbing allegations from as recently as late January to February 2026, which assert that detained individuals continue to be denied access to necessary medical care and subjected to other inhumane conditions in the Baltimore hold rooms.  These allegations include that:

   a.  One individual who was in renal failure and denied dialysis during detention waived their legal rights to participate in a removal proceeding in order to be deported and receive care outside the United States.

   b.  One diabetic individual was denied medication for multiple days and experienced a health crisis from lack of medication.

    c.   One individual with a benign brain tumor who was detained for more than ten days was denied transport for a medical appointment, denied necessary medication, and denied a medically prescribed diet.

    d.   One individual with asthma experienced deteriorating health over a three-day period and was ultimately diagnosed with pneumonia.

    e.   One individual who was wearing an adult diaper when taken into custody was not provided with sanitary products and forced to live in their own excrement for five days.

    f.   Detained individuals have been provided food in the Baltimore hold rooms that was described as "dog food" and inedible.

33.    In reported whistleblower allegations, a former worker at the ICE Baltimore Field Office confirmed detained individuals' accounts of conditions in the hold rooms, describing blankets "covered in feces, lice, urine, and throw up;" an incident in which a detained individual who had returned from the hospital was placed in a restraint chair; and the field office's failure to provide menstruating women hygiene products.  Eric Flack & Ruth Morton, *Former ICE Facility Worker 'saw people laying in feces' at Baltimore Detention Center*, WUSA9 (Feb. 6, 2026, 7:52 PM), https://www.wusa9.com/article/news/investigations/ice-detention-facility-overcrowding-baltimore-whistleblower-dhs-unsanitary-trump/65-03dda8d7-49a9-4caf-b001-db5e12a04158 (last updated Feb. 7, 2026, 11:59 AM) [https://perma.cc/T6CU-47J2].

34.    These allegations and media reports suggest that since conditions in the Baltimore hold rooms were first reported early last year, detention conditions there have worsened.

35.    The first media reports of overcrowding, extended lengths of detention, and other alarming conditions in ICE hold rooms in the Fallon Federal Building appeared in March 2025.

*See* John-John Williams IV & Daniel Zawodny, *'It's scary right now': ICE holds detainees for days in bedless Baltimore cells*, Balt. Banner (Mar. 14, 2025, 5:30 AM), https://www.thebanner.com/politics-power/state-government/ice-baltimore-trump-immigration-deportation-detention-WNRGQUGLTVHD3MBFV4QUMEKDYM/ [https://perma.cc/QD6E-4MJY]; Emily Hofstaedter, "I was pulling out my hair." *She spent days without food, beds, and sunlight in the Baltimore ICE holding rooms*, WYPR (Mar. 15, 2025, 4:02 PM), https://www.wypr.org/wypr-news/2025-03-15/i-was-pulling-out-my-hair-she-spent-days-without-food-beds-and-sunlight-in-the-baltimore-ice-holding-rooms [https://perma.cc/SS97-F3G9].

36.    These conditions resulted from the administration's increased immigration-enforcement efforts that have strained existing detention capacity. *See* Baltimore Waiver Mem., Ex. C, at 1 (noting that "[a]n increased nationwide operating posture has been implemented making detention space less readily available"); Nationwide Waiver Mem., Ex. D, at 2 (describing how "[a]s a result of increased enforcement efforts, ERO's average daily population has significantly increased to over 54,000" and that because "field offices no longer have the option to discretionarily release [noncitizens] aliens, nor decline to take [noncitizens] into custody from counterparts" in Homeland Security Investigations (HSI) or U.S. Customs and Border Protection (CBP) "field offices have had to resort to holding aliens in holding facilities beyond . . . the 12-hour limit").[3]

---

[3] The Baltimore Field Office also stated that Maryland's Dignity Not Detention Act "eliminated all detention space for the ERO Baltimore Field Office within the state of Maryland." Baltimore Waiver Mem., Ex. C, at 1. The Dignity Not Detention Act, which Maryland enacted in 2021, "prohibit[s] certain governmental entities from entering into agreements facilitating immigration-related detention by private entities; prohibit[s] governmental entities from entering into certain agreements to house immigration-related detainees; [and] require[s] governmental

37.    As early as February 9, 2025, the Baltimore Deputy Field Office Director explained in a memorandum requesting medical personnel that the Baltimore Field Office does not have on-site medical staff and must therefore transport individuals requiring medication or medical attention to nearby hospitals.  *See* Baker Mem., Ex. B.  The Deputy Field Office Director warned that "the absence of medical staff [at the Baltimore Field Office] to provide [medical] support could potentially lead to liability issues or, in the worst-case scenario, fatalities."  *Id.* at 3.

38.    In May 2025, immigration advocacy groups sued on behalf of an individual plaintiff and putative class alleging unlawful conditions in the Baltimore hold rooms.  *See* Complaint and Petition for Writ of Habeas Corpus, *D.N.N.*, No. 1:25-cv-01613-JRR, ECF 1 (D. Md. May 5, 2025); *see also* Second Amended Complaint and Petition for Writ of Habeas Corpus, *D.N.N.*, No. 1:25-cv-01613-JRR, ECF 52 (D. Md. July 11, 2025).[4]  An order granting the *D.N.N.* plaintiffs' motion for preliminary injunction and class certification was granted on March 6, 2026.  *D.N.N.*, No. 1:25-cv-01613-JRR, ECF 171 (D. Md. Mar. 6, 2026).

_____

entities to terminate certain existing contracts for the detention of immigration-related detainees," thereby limiting the availability of detention space.  Dignity Not Detention Act, H.B. 16, 2021 Leg., 443rd Sess. (Md. 2021); 2021 Md. Laws ch. 19.

[4] In June 2025, OAG submitted an amicus brief for the State of Maryland in support of the *D.N.N.* plaintiffs' motion for a preliminary injunction to compel DHS and ICE to halt their violations of plaintiffs' rights in the Baltimore hold rooms.  *See* Brief for State of Maryland as Amicus Curiae, *D.N.N.*, No. 1:25-cv-01613-JRR, ECF 38 (D. Md. June 18, 2025) (attached as Exhibit F).  OAG explained that "[b]y indefinitely detaining immigrants in overcrowded, unsanitary conditions without reliable access to appropriate sanitation and bathing facilities, adequate food and water, or life-sustaining medications such as those used to treat diabetes and HIV, ICE [ ] has created an unacceptable risk to Maryland's public health."  *Id.* at 14. OAG argued that the conditions described "fall far short of the minimal treatment acceptable under the United States Constitution as well as the standards that Maryland has established for its own detention facilities," and therefore contravene Maryland public policy that detention facilities in the State "must meet a minimal level of safety and decency."  *Id.* at 7, 9.

39.    Declarations provided from individuals detained in the Baltimore hold rooms in support of the putative class action describe individuals being held in overcrowded conditions, without adequate access to sanitation or bedding, without having been meaningfully screened for infectious disease, medical needs, or disability accommodations, and with limited access to health care.  The following statements illustrate some of the conditions in the hold rooms:

    a.    From an individual who was detained in February 2025: "I became so stressed that I began to pull my hair out.  I would bang my head on the concrete wall, because I did not know what to do. . . . Things were so bad I wanted to die."  Declaration of April Amaya-Louis, Exhibit 11 to Declaration of Amelia Dagen in Support of Plaintiffs' Motion for Class Certification, *D.N.N.*, No. 1:25-cv-01613-JRR, ECF 31-14, ¶ 15 (D. Md. June 6, 2025) (attached as Exhibit G).

    b.    From an individual who was detained in August 2025: "The cell was incredibly cold and made of pure cement.  It was severely crowded.  There were no beds, we all slept on the floor and were given a thin small cushion to sleep on.  It was horrible."  Declaration of Yamileth Arely Martir de Medina, Exhibit 11 to Plaintiffs' Renewed Motion for Class Certification and Preliminary Injunction, *D.N.N.*, No. 1:25-cv-01613-JRR, ECF 127-13, ¶ 7 (D. Md. Dec. 23, 2025) (attached as Exhibit H).

    c.    From an individual who was detained in October 2025: "There were not showers, only a toilet that did not have any privacy as it was located in an open area in the holding room. . . . I was only able to take a shower on the seventh day of being detained after leaving Baltimore.  If someone wanted to use the toilet, it was an open area and someone else had to shield the person use it to ensure a bit of

privacy." Declaration of Gustavo Adolfo Garcia-Vigil, Exhibit 10 to Plaintiffs' Renewed Motion for Class Certification and Preliminary Injunction, *D.N.N.*, No. 1:25-cv-01613-JRR, ECF 127-12, ¶¶ 5, 7 (D. Md. Dec. 23, 2025) (attached as Exhibit I).

d. From an individual who was detained in November 2025: "When I was arrested and taken to Baltimore, ICE asked if I had a medical situation. I told them I have leukemia. They said okay and asked if someone could bring my pills to Baltimore for me. My friend brought my pills but couldn't come for about two days. For those first two days, ICE didn't take me to the doctor or give me medicine." Declaration of Alexnader Antonio Salazar Monge, Exhibit 12 to Plaintiffs' Renewed Motion for Class Certification and Preliminary Injunction, *D.N.N.*, No. 1:25-cv-01613-JRR, ECF 127-14, ¶ 15 (D. Md. Dec. 23, 2025) (attached as Exhibit J).

40.    In its opinion granting the *D.N.N.* plaintiffs' motion for preliminary injunction and class certification, this Court preliminarily found that:

- Individuals detained in the Baltimore Hold Room are routinely held there overnight and in excess of 12 hours.

- Individuals detained in the Baltimore Hold Rooms are often held there for more than 72 hours.

- ICE routinely exceeds the maximum capacity of 56 individuals in the Baltimore Hold Rooms, and has detained more than 120 individuals in the Baltimore Hold Rooms in one day, which is over 200% of its maximum capacity.

- ICE routinely exceeds its own unofficially-assigned maximum capacity of 35 individuals in a larger cell at one time.

- Individuals detained in the Baltimore Hold Rooms are not able to bathe or shower.

- Individuals detained in the Baltimore Hold Rooms are routinely required to use the toilet with minimal or no privacy.

- Individuals detained in the Baltimore Hold Rooms are routinely subjected to unsanitary environments, including unclean cells and toilets.

- Individuals detained in the Baltimore Hold Rooms are not provided access to clean clothes or basic hygiene items on a routine basis; sometimes not at all.

- Individuals detained in the Baltimore Hold Rooms are routinely denied their medications or medical care, or not provided necessary access to same.

- ICE does not screen for medical needs of individuals detained in the Baltimore Hold Rooms.

Mem. Op., *D.N.N.*, No. 1:25-cv-01613-JRR, ECF 170, at 51 (D. Md. Mar. 6, 2026) (attached as Exhibit K).

41.    Based on those preliminary findings, this Court held that the *D.N.N.* plaintiffs "ma[de] a clear showing that they are likely to succeed in showing that Defendants deprive individuals detained in the Baltimore Hold Rooms of hygienic, sanitary, and safe conditions, as well as basic medical screening and care, in violation of their rights guaranteed by the Fifth Amendment to the United States Constitution." *Id.* at 63.

42.    This Court entered a preliminary injunction enjoining and restraining the *D.N.N.* defendants from detaining persons in the hold rooms "without adequate medical care and screening," or from holding persons "in a manner where":

i.  Each Detained Individual has personal space of less than 31 square feet (exclusive of floor area within eight feet from any toilet);

ii.  A Hold Room is not cleaned thoroughly at least once each day by ICE staff or ICE contracted employees; and

iii.  A Hold Room is not furnished with adequate supplies of hygiene products to give each Detained Individual adequate daily supplies of soap, towels, toilet paper, oral hygiene items (including toothbrushes

and toothpaste), and feminine hygiene products (for female Detained
Individuals), with Detained Individuals provided hygiene products to
keep on their person[.]

Order, No. 1:25-cv-01613-JRR, ECF 171, at 2–3 (D. Md. Mar. 6, 2026) (attached as Exhibit L).

43.    The *D.N.N.* preliminary injunction does not address ICE's alleged denial of

adequate food and water to detainees, nor does it address ICE's alleged denial of access to counsel

or inappropriate use of force. OAG does not know what actions, if any, ICE will take in response

to the *D.N.N.* preliminary injunction.[5]

44.    Further, going forward, OAG has an interest in documenting and assessing past

civil rights violations to ensure that Defendants are complying with civil rights and relevant federal

laws when engaging in immigration detention, including when ICE is not under court order to do

so. ICE seeks to significantly expand immigration detention in Maryland, including at sites in

Elkridge (in Howard County) and Williamsport (in Washington County). ICE plans to construct

these facilities on an expedited basis with little consultation with the State and little apparent

planning. ICE has contracted to transform a commercial warehouse into a detention facility for

1,500 detainees by May 4, 2026, less than 60 days from the award of the contract. DHS Delivery

Order No. 70CDCR26FR0000035 to KVG LLC,

https://www.usaspending.gov/award/CONT_AWD_70CDCR26FR0000035_7012_N0002325D0

048_9700 [https://perma.cc/EK6B-ZDG7]. The timeline proposed is grossly inadequate to

---

[5]    A visit by several members of Congress after the injunction was entered found no
individuals detained in the hold rooms, but lawmakers "weren't given any information about what
had happened to the people detained there as recently as last week." *See* Brenda Wintrode, *No
detainees at Baltimore ICE facility during congressional visit*, Balt. Banner (Mar. 9, 2026, 10:45
AM), https://www.thebanner.com/politics-power/state-government/congress-visit-immigration-
baltimore-74YI6RHWPFF4LO5FO7QVFHHRIY/ [https://perma.cc/T758-HVE7]. OAG also has
no information about the present status of any detainees or how ICE intends to ameliorate
conditions in the hold rooms.

construct a facility that meets the basic needs of detainees. *Cf.* Dep't of Justice, Office of the Inspector Gen., *Audit of the Federal Bureau of Prisons' Efforts to Maintain and Construct Institutions* (May 2023), https://oig.justice.gov/sites/default/files/reports/23-064_1.pdf [https://perma.cc/BGH3-6QMC] (noting that prison construction normally takes years). Whether ICE has a pattern or practice of unconstitutional treatment—which OAG's investigation seeks to discover—is thus relevant to whether ICE may violate the rights of detainees at the planned facilities, as well.

45.     Given mounting evidence of potential civil rights violations and that OAG is investigating serious threats to human health and safety, the Hold Room Investigation is ongoing. The information sought in the State's subpoena will assist OAG to substantiate or refute allegations of unconstitutional conduct by ICE in the Fallon Federal Building.

## II.     OAG Administrative Subpoena and *Touhy* Letter

46.     In furtherance of the Hold Room Investigation, and consistent with standard practice in civil rights investigations, on January 30, 2026, OAG sent an administrative subpoena for documents to the targets of its investigation—DHS and ICE. *See* OAG *Touhy* Letter and Administrative Subpoena (Jan. 30, 2026) (attached as Exhibit M).

47.     OAG typically issues subpoenas to investigative targets for three important reasons: first, to provide entities under investigation the opportunity to produce relevant, potentially exculpatory, information; second, to create a full investigative record because targets often possess information exclusively within their control; and third, because only the targets themselves—rather than third-parties—are best positioned to authenticate the information in their possession.

48.     OAG issued the subpoena at issue here pursuant to State law authorizing the request for documents in connection with an investigation of civil rights violations, including whether

persons are being denied basic constitutional rights based on their national origin, race, or ethnicity. Md. Code Ann., State Gov't § 20-1044(b) ("During any examination, investigation, or hearing, the Office of the Attorney General may (1) subpoena witnesses; (2) administer oaths; (3) examine individuals under oath; and (4) compel production of records, books, papers, contracts, and other documents.").

49.    The subpoena includes nine specific, time-limited requests for documents. *See* OAG *Touhy* Letter and Administrative Subpoena, Ex. M, at 16–17.

50.    OAG complied with DHS's *Touhy* regulations by seeking the production of documents from DHS and ICE pursuant to a State subpoena. 6 C.F.R. § 5.41(a)(2) (establishing regulations for "response[s] to subpoenas, orders, or other requests or demands of federal or state judicial or quasi-judicial or administrative authority"); *see also Doan v. Bergeron*, No. 15-CV-11725-IT, 2016 WL 5346936, at *1 (D. Mass. Sept. 23, 2016) ("DHS'[s] *Touhy* regulations specifically recognize . . . that a demand for information from the agency may be made by a subpoena").

51.    OAG sent the subpoena to DHS and ICE, along with a letter describing "the nature and relevance of the official information sought." 6 C.F.R. § 5.45(a). *See* OAG *Touhy* Letter and Administrative Subpoena, Ex. M.

52.    The *Touhy* letter described the information OAG sought about conditions in the hold rooms and the individuals detained in those hold rooms. In particular, OAG seeks information about: (1) conditions in the hold rooms, specifically overcrowding, extended duration of detention, and other mistreatment (i.e., failure to provide medical attention, failure to provide sufficient food and water, failure to provide an adequate sleep environment, failure to provide access to hygienic and sanitary conditions, and failure to provide access to legal counsel); (2) demographics of the

individuals detained in the hold rooms; and (3) the legal basis for their arrest and detention.  *See id.* at 4–5.

53.    The *Touhy* letter described how each category of information is relevant to OAG's civil rights investigation.  *See id.* at 5–9.  First, "information about conditions in the hold rooms is relevant to the alleged injuries which threaten the public interest and welfare of Maryland residents and therefore form the basis of OAG's investigation." *Id.* at 5.  Second, information about detainee demographics is relevant to OAG's investigation of whether ICE is "[s]ubjecting individuals to unequal treatment and/or treatment in violation of constitutional protections and other standard detention practices on the basis of protected characteristics, including national origin." *Id.* at 6. Third, information about "the legal bases for arrest and detention are relevant to OAG's investigation of potential civil rights violations, including due process and equal protection violations," because "individuals [may] have been subject to the overcrowding and other conditions . . . because they have been denied due process protections (e.g., access to legal counsel, right to individualized determinations of danger or flight risk)" on the basis of protected characteristics. *Id.* at 7–8.

54.    Further, the information sought is generally within DHS and ICE's exclusive control and are required to assess Defendants' knowledge of the conditions and, relatedly, their motivation in subjecting detained individuals to such conditions.  Evidence of knowledge and motivation is necessary to evaluate potential constitutional violations.  *See, e.g.*, *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015) (objective reasonableness standard for a pretrial detainee's Fourteenth Amendment claim of excessive force); *Escobar-Salmeron v. Moyer*, 150 F. 4th 360, 372–73 (4th Cir. 2025) (malicious and sadistic standard for an inmate's Eight Amendment

claim of excessive force); *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976) (deliberate indifference standard for Eighth Amendment claim of failure to provide adequate medical care in prison).

55.    For example, OAG requests "[a]ll documents [in Defendants' possession, custody, or control] related to any report, assessment, or investigation conducted by any officer or agent of the United States, or by any person on behalf of the United States, of the conditions in or operation of the Hold Rooms in the Fallon Federal Building within the last eighteen (18) months."  OAG *Touhy* Letter and Administrative Subpoena, Ex. M, at 16 (Request No. 2).  OAG also requests "[a]ll complaints or grievances or other communications . . . within the last twelve (12) months . . . and any response to complaints, grievances, or report[s] concerning the treatment of Detainees in the Hold Rooms in the Fallon Federal Building or the conditions in the Hold Rooms in the Fallon Federal Building." *Id.* (Request No. 3).  These documents can provide evidence of what ICE knew of conditions in the Baltimore Field Office.

56.    Obtaining this documentation directly from ICE—rather than relying on copies or media reports—is important "to establish the authenticity of the records."  *See SEC v. Richman*, No. 21-CV-01911-CRB(LB), 2021 WL 4951484, at *2 (N.D. Cal. Oct. 25, 2021).

57.    Consistent with DHS's *Touhy* regulations, OAG sent the subpoena and *Touhy* letter by certified mail and e-mail to DHS's Office of the General Counsel (OGC), as well as to ICE's Office of the Principal Legal Advisor (OPLA).  6 C.F.R. § 5.43(a) ("[O]nly [OGC] is authorized to receive and accept subpoenas . . .  directed to . . . [DHS], or any component thereof, . . . for [m]aterial, including documents, contained in the files of [DHS] . . . ."); *see also id.* § 5.43(g) (describing method of service).

58.    Given the alarming nature of the allegations described in the *Touhy* letter, OAG requested a formal response to its *Touhy* request within fourteen (14) days, that is, no later than

February 13, 2026.    OAG *Touhy* Letter and Administrative Subpoena, Ex. M, at 1.    The administrative subpoena also included a response date of February 13, 2026.  *Id.* at 11.

### III.    ICE Denies OAG's *Touhy* Request

59.    DHS OGC and ICE OPLA received OAG's subpoena and *Touhy* letter on or about January 30, 2026.  *See* Letter from Rachel Knight, Associate Legal Advisor, U.S. ICE, to Jonathan M. Smith, Assistant Attorney General, OAG at 1 (Feb. 25, 2026) (attached as Exhibit N) ("Copies of your *Touhy* request letter and administrative subpoena dated January 30, 2026 . . . were received by DHS Office of General Counsel . . . on January 30, 2026, and forwarded by email to the ICE Office of the Principal Legal Advisor . . .  on or about January 30, 2026.").

60.    On February 12, 2026, an attorney from ICE OPLA e-mailed OAG counsel confirming receipt of the letter and subpoena, acknowledging the February 13 response deadline, and requesting "a brief extension" to February 20.  Email from Angela M. Fiorentino-Rios to Yasmin Dagne et al. at 6–7 (Feb. 12, 2026) (attached as Exhibit O).  That same day, OAG counsel agreed to the one-week extension, explaining that OAG expected to receive a response on or before February 20.  *Id.* at 6.  An ICE OPLA attorney responded, acknowledging the extension.  *Id.* at 5.

61.    On February 20, 2026, ICE OPLA attorneys did not provide any response, so the next day, OAG counsel e-mailed ICE OPLA attorneys for an update.  Email from Yasmin Dagne to Angela M. Fiorentino-Rios et al. (Feb. 20, 2026), Ex. O, at 4.  OAG did not hear from ICE OPLA until five days after the agreed-upon response deadline.  *See id.* at 3–4.

62.    On February 25, 2026—nearly four weeks after OAG issued its subpoena and *Touhy* letter—ICE denied OAG's *Touhy* request in full, stating "your request for the production of documents is denied pursuant to the DHS *Touhy* regulations."  Letter from Rachel Knight, Ex. N, at 1.

63.     In denying OAG's request, ICE relied on three general objections: (1) that the requests are overly broad, (2) that the requests are unduly burdensome, and (3) that the requested information implicates privacy protections.  ICE also objected that certain requests do not seek relevant information.

64.     ICE did not cite the 6 C.F.R. § 5.48 factors in its response and did not specifically address how the requests were overly broad or unduly burdensome, nor did it offer to provide documents that had been redacted to remove private information.

65.     To the contrary, ICE suggested that any attempt to "modif[y] [OAG's requests] to appropriately narrow and identify the information sought" would be futile because "the information requested would still likely be unduly burdensome and duplicative" and its disclosure "would violate the Privacy Act of 1974 . . . or otherwise cause an unwarranted invasion of personal privacy."  Letter from Rachel Knight, Ex. N, at 6.

66.     On February 27, 2026, OAG provided ICE a letter in response detailing numerous deficiencies in its denial of OAG's *Touhy* request.  *See* Letter from Jonathan Smith and Adam Kirschner, Assistant Attorneys General, OAG to Rachel Knight, Associate Legal Advisor, U.S. ICE (Feb. 27, 2026) (attached as Exhibit P).  In the letter, OAG raised five deficiencies:

    a.  First, ICE's denial did not identify or adequately address the factors ICE is required to consider "[i]n deciding whether to comply with a [*Touhy*] demand or request," 6 C.F.R. § 5.48(a);

    b.  Second, ICE provided little to no explanation for its objections that requests are "overly broad" (even as it objected to all nine requests on that basis);

    c.  Third, ICE's objection that requests are "unduly burdensome" appears to have been premised on the factually incorrect assertion that the requests are "duplicative" of

materials exchanged in *D.N.N.* and the legally incorrect assertion that Plaintiff could obtain requested documents through the *D.N.N.* litigation, even though Plaintiff is not a party to that litigation and confidential material are protected from disclosure pursuant to a court order;

d.  Fourth, ICE mistakenly invoked privacy concerns to object to certain requests that do not seek protected information, and to the extent that requested documents implicate privacy concerns, did not offer to redact or otherwise anonymize protected information; and

e.  Fifth, ICE's denial ignored OAG's detailed, written explanation of how the documents sought are relevant to OAG's investigation.

67.     OAG requested that ICE respond within one week, or by March 6, 2026.

68.     In a one-paragraph email on March 6, ICE said that it "need[ed] additional time to confer internally to determine if [the agency] can implement reasonable parameters to sharing information responsive to your *Touhy* request and administrative subpoena."  Email from Rachel Knight to Yasmin Dagne et al. (Mar. 6, 2026), Ex. O, at 2.  It indicated that it "should be able to provide a further response by Monday, April 6, 2026."  *Id.*  ICE did not substantively respond to any of the points raised in OAG's February 27 letter.

69.     OAG replied the same day:  "It has now been five weeks since we initially served our *Touhy* request.  As we have detailed, however, this matter is of great urgency.  We do not consider a monthlong delay to decide whether you 'can' produce anything to be reasonable or consistent with your *Touhy* obligations."  *Id.* at 1.  ICE responded only that "it will stay focused on resolving this matter as soon as possible," with no further elaboration.  *Id.*

# CLAIMS FOR RELIEF

## Count I—Administrative Procedure Act (Contrary to Law)

70.    Plaintiff State of Maryland incorporates by reference the allegations in the preceding paragraphs.

71.    The Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706, authorizes judicial review of final actions of a federal agency or officer.  A court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D).

72.    ICE's February 25 response to OAG's *Touhy* request "advised [OAG] in writing that the agency would not produce the materials demanded" and "was a final agency action that is ripe for [this Court's] review under the APA."  *COMSAT Corp.*, 190 F.3d at 274–75; *see also Yousuf v. Samantar*, 451 F.3d 248, 251 (D.C. Cir. 2006).

73.    Under 6 C.F.R. § 5.48(a), "[i]n deciding whether to comply with a [subpoena]," ICE and DHS "shall consider, among any other pertinent considerations," a list of eight factors.

74.    "6 C.F.R. § 5.48(a) *requires* DHS [and its components] to consider the enumerated factors," although the regulation "allows the consideration of additional factors."  *RLI Ins. Co.*, 2020 WL 1496466, at *3 n.5 (emphasis added).

75.    In its February 25 response to OAG's subpoena, ICE did not identify the enumerated factors under 6 C.F.R. § 5.48(a) and did not indicate through its reasoning that the factors had been considered.  *Cf. Spence v. NCI Info. Sys.*, 530 F. Supp. 2d 739, 745 (D. Md. 2008).

76.    Because "6 C.F.R. § 5.48(a) *requires* DHS [and its components] to consider the enumerated factors," *RLI Ins. Co.*, 2020 WL 1496466, at *3 n.5 (emphasis added), ICE's failure

to consider them means that its denial of OAG's subpoena was "not in accordance with law" and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

77.    The Court should declare that ICE's denial of OAG's subpoena was "not in accordance with law" and "without observance of procedure required by law," 5 U.S.C. § 706(2)(A), (D); vacate and set aside ICE's decision; and order DHS and ICE to produce the documents requested.

### Count II—Administrative Procedure Act (Arbitrary and Capricious)

78.    Plaintiff State of Maryland incorporates by reference the allegations in the preceding paragraphs.

79.    The Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706, authorizes judicial review of final actions of a federal agency or officer. A court must "hold unlawful and set aside agency action" that is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A).

80.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

81.    ICE's February 25 response to OAG's *Touhy* request "advised [OAG] in writing that the agency would not produce the materials demanded" and "was a final agency action that is ripe for [this Court's review under the APA." *COMSAT Corp.*, 190 F.3d at 274–75; *see also Yousuf v. Samantar*, 451 F.3d 248, 251 (D.C. Cir. 2006).

82.    ICE's refusal to comply with OAG's subpoena was arbitrary and capricious because ICE "failed to consider important aspects of the dispute," "misapplied [its] *Touhy* regulations," and

acted "counter to the evidence presented." *See In re Subpoena to NSF OIG*, 2018 WL 5017612, at *4 (quoting *Lamb*, 2018 WL 847242, at *6).

83.    ICE "entirely failed to consider [ ] important aspect[s] of the problem." *See State Farm*, 463 U.S. at 43.  ICE did not identify or consider the eight enumerated factors required by 6 C.F.R. § 5.48(a).  It also "failed to consider other factors relevant to the decision," *see Schroeder*, 673 F. Supp. 3d at 1219, such as that OAG's investigation involves "constitutional violation[s] of great magnitude."  *See Lamb*, 2018 WL 847242, at *6 (noting that agency "failed to consider . . . the seriousness of the action Plaintiffs have brought").

84.    Moreover, ICE "offered an explanation for its decision that runs counter to the evidence before the agency."  *See State Farm*, 463 U.S. at 43.  ICE primarily alleged that the requests are unduly burdensome.  But ICE did not "elaborate further on the purported burden," which means that the "generalized assertion that [compliance] would be 'overly burdensome'" "cannot . . . be a valid exercise of [ICE's] discretion."  *Cf. United States v. Fleet Mgmt.*, No. CRIM. 07-279, 2008 WL 1848102, at *3 (E.D. Pa. Apr. 24, 2008).

85.    ICE did assert (incorrectly) that OAG could have obtained some of the information sought through the discovery provided in the *D.N.N.* litigation.  As an amicus curiae in that case, OAG "cannot conduct discovery" in *D.N.N.*, *see Pueblo of Santa Ana v. Nash*, 854 F. Supp. 2d 1128, 1135 (D.N.M. 2012), nor can it readily obtain documents from plaintiffs' counsel due to a stipulated confidentiality agreement and protective order.  *See* Stipulated Confidentiality Agreement and Protective Order, *D.N.N.*, No. 1:25-cv-01613-JRR, ECF 119 (D. Md. Nov. 26, 2025).  In any event, many of the documents sought by OAG's subpoena fall outside the scope of plaintiffs' discovery requests in *D.N.N.*, and Defendants cite no authority that holds a State's

independent investigation should be limited by what discovery was obtained in private litigation to which the State was not a party.

86.    To the extent that OAG's subpoena partially overlaps with the *D.N.N.* discovery, the fact that ICE "already produced" some of the same documents "in response to another lawsuit" means that the request is "*not* unduly burdensome." *See Tri-City R.R. Co. v. Preferred Freezer Servs. of Richland*, No. 2:19-CV-00045-SAB, 2020 WL 533143, at *2 (E.D. Wash. Feb. 3, 2020) (emphasis added); *see also Lamb*, 2018 WL 847242, at *6 (explaining that "Plaintiffs' request . . . [was] not particularly burdensome" because the agency "ha[d] already conducted the search for records that Plaintiffs seek"). The partial overlap with documents produced in *D.N.N.* merely confirms that production "would have no effect on the economy and efficiency of the [agency]'s operations." *See In re Subpoena to NSF OIG*, 2018 WL 5017612, at *3.

87.    Finally, ICE failed to consider alternatives to its blanket refusal to comply with the subpoena. ICE did not, for example, offer to "produce [any] documents it concede[d] are relevant and non-privileged and which may be produced without an undue burden." *Cf. Doan v. Bergeron*, No. 15-CV-11725-IT, 2016 WL 5346936, at *3 (D. Mass. Sept. 23, 2016) (concluding that "DHS [was] acting arbitrarily in refusing to produce even the concededly relevant information"). Nor did ICE consider whether it could "adequately protect any private information with appropriate redactions." *See In re Subpoena to NSF OIG*, 2018 WL 5017612, at *3. Instead, ICE asserted that any attempt to "modif[y] [OAG's requests] to appropriately narrow and identify the information sought" would be futile because "the information requested would still likely be unduly burdensome and duplicative" and its disclosure "would violate the Privacy Act of 1974 . . . or otherwise cause an unwarranted invasion of personal privacy." Letter from Rachel Knight, Ex. M, at 6.

88.    The Court should declare that ICE's denial of OAG's subpoena was arbitrary and capricious, 5 U.S.C. § 706(2)(A); vacate and set aside ICE's decision; and order DHS and ICE to produce the documents requested.

**Count III—Administrative Procedure Act (Unreasonable Delay)**

89.    Plaintiff State of Maryland incorporates by reference the allegations in the preceding paragraphs.

90.    The Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706, authorizes a court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

91.    In "determining whether agency action has been unreasonably delayed," courts find "helpful guidance" in the six factors listed by the D.C. Circuit in *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) ("*TRAC*"). *See Gonzalez v. Cuccinelli*, 985 F.3d 357, 375 (4th Cir. 2021).

92.    The *TRAC* factors are:

(1) the time agencies take to make decisions must be governed by a rule of reason;

(2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;

(3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

(4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;

(5) the court should also take into account the nature and extent of the interests prejudiced by delay; and

(6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*Id.* (quoting *TRAC*, 750 F.2d at 80).

93.     In the alternative to Counts I and II, to the extent that Defendants assert ICE has reconsidered its decision to deny OAG's *Touhy* request in full, Defendants have unreasonably delayed responding to OAG's *Touhy* request.

94.     Defendants' failure to comply promptly with OAG's subpoena has not been "governed by a rule of reason." *See id.* (quoting *TRAC*, 750 F.2d at 80).  Defendants refused to produce any documents in response to OAG's subpoena and—to the extent they assert they reconsidered that decision—have offered no explanation for why an additional month is needed to determine "if [the agency] can implement reasonable parameters to sharing information responsive to [OAG's] *Touhy* request."  Email from Rachel Knight, Ex. O, at 2; *see Duarte v. Mayorkas*, No. C 12-03647 RS, 2012 WL 12884630, at *2 (N.D. Cal. Aug. 21, 2012) ("The agency cannot eviscerate the final agency decision requirement by simply stalling."), *aff'd mem. sub nom. Asparren v. Mayorkas*, 529 F. App'x 826 (9th Cir. 2013) (per curiam).

95.     Defendants' delay is "less tolerable" in this case because "human health and welfare are at stake." *Gonzalez*, 985 F.3d at 375 (quoting *TRAC*, 750 F.2d at 80).  OAG is investigating allegations that persons detained at the Fallon Federal Building have been denied adequate food, water, and medical treatment.  By impeding OAG's investigation, Defendants are preventing OAG from taking action in relation to those threats.  *See Pub. Citizen Health Research Grp. v. Comm'r, FDA*, 740 F.2d 21, 34 (D.C. Cir. 1984) ("When the public health may be at stake, the agency must move expeditiously to consider and resolve the issues before it.").

96.     Likewise, "[t]he interests prejudiced by delay are substantial." *See Am. Acad. of Pediatrics v. U.S. FDA*, 330 F. Supp. 3d 657, 666 (D. Mass. 2018).  Defendants' failure to respond is preventing OAG from fully investigating serious allegations of unconstitutional conditions.

97.     Conversely, Defendants cannot show that expediting their response would have a significant "effect . . . on agency activities of a higher or competing priority." *Cf. Gonzalez*, 985 F.3d at 375 (quoting *TRAC*, 750 F.2d at 80).  Some—though not all—of the documents sought were already produced to the plaintiffs in the *D.N.N.* lawsuit.  At minimum, production of those documents, "would have no effect on the economy and efficiency of the [agency]'s operations." *See In re Subpoena to NSF OIG*, 2018 WL 5017612, at *3.

98.     In the alternative to Counts I and II, the Court should declare that Defendants' response to OAG's subpoena has been unreasonably delayed, 5 U.S.C. § 706(1), and order Defendants to respond to the subpoena on an expedited schedule determined by the Court.

**REQUESTS FOR RELIEF**

Plaintiff State of Maryland requests that the Court:

(a) declare that Defendant ICE's February 25, 2026 denial of OAG's January 30, 2026 request for documents is contrary to law and/or arbitrary and capricious, or, in the alternative, that Defendant ICE's response has been unreasonably delayed;

(b) set aside ICE's denial of OAG's request for documents;

(c) order DHS and ICE to produce the documents requested;

(d) enjoin Defendants DHS and ICE from relying on any bases this Court rejects in any future reconsideration of Plaintiff's request for documents and any supplemental requests for documents for its Hold Room Investigation without additional explanation;

(e) award Plaintiff their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

(f) grant such other relief as the Court may deem proper.

Date: March 10, 2026

**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

By: */s/ Yasmin Dagne*
Yasmin Dagne (D. Md. Bar No. 32016)
Keith M. Jamieson (D. Md. Bar No. 31543)
Adam Kirschner (D. Md. Bar No. 31767)
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
ydagne@oag.maryland.gov
410-576-1580

*Attorneys for the State of Maryland*