**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| STATE OF MARYLAND,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>TODD M. LYONS, Senior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; MARKWAYNE MULLIN, Secretary, U.S. Department of  Homeland Security; and UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br><br>　　　　Defendants. | Civ. No. 1:26-cv-01024-JRR |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
<u>FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 1

    I.      Legal Background ................................................................................................ 1

    II.     Factual Background............................................................................................. 3

        A.    OAG investigation of ICE hold rooms in the Fallon Federal Building......................... 3

        B.    OAG administrative subpoena and Touhy letter ......................................................... 7

        C.    ICE denial of OAG's Touhy request ........................................................................... 10

STANDARD OF REVIEW ............................................................................................... 12

ARGUMENT ..................................................................................................................... 14

    I.      ICE's Denial of Plaintiff's Touhy Request and Administrative Subpoena Is
Contrary to Law and Arbitrary and Capricious. ............................................................ 14

        A.    ICE's Denial of Plaintiff's Touhy Request and Administrative Subpoena Is
Final Agency Action. ................................................................................................. 14

        B.    ICE's Denial of Plaintiff's Touhy Request and Administrative Subpoena Is
Contrary to Law. ....................................................................................................... 16

        C.    ICE's Denial of Plaintiff's Touhy Request and Administrative Subpoena Is
Arbitrary and Capricious. .......................................................................................... 18

    II.     In the Alternative, ICE's Response to Plaintiff's Touhy Request and
Administrative Subpoena Is Unreasonably Delayed. ..................................................... 22

CONCLUSION.................................................................................................................. 26

i

# TABLE OF AUTHORITIES

## Case Law

*Akter v. Rubio*, 805 F. Supp. 3d 37 (D.D.C. 2025)..........................................................................23

*Am. Acad. of Pediatrics v. U.S. FDA*, 330 F. Supp. 3d 657 (D. Mass. 2018) ..............................24

*Am. Bar Ass'n v. U.S. Dep't of Educ.*, 370 F. Supp. 3d 1 (D.D.C. 2019).....................................15

*Andreas-Myers v. NASA*, No. GJH-16-3410, 2017 WL 1632410 (D. Md. Apr. 28, 2017)........................................................................................................................2, 3, 13

*Asparren v. Mayorkas*, 529 F. App'x 826 (9th Cir. 2013)..............................................................15

*Bennett v. Spear*, 520 U.S. 154 (1997)...........................................................................................15

*CCA of Tenn. v. Dep't of Veterans Affs.*, No. 09-CV-2442, 2010 WL 1734953 (S.D. Cal. Apr. 27, 2010) ............................................................................................................13

*City of Pembroke Pines v. U.S. Immigr. & Customs Enf't*, 141 F. Supp. 3d 1330 (S.D. Fla. 2015) ........................................................................................................................ 1

*Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236 (4th Cir. 1989).....................................................13

*COMSAT Corp. v. NSF*, 190 F.3d 269 (4th Cir. 1999)............................................................ passim

*Ctr. for Sci. in the Pub. Interest v. Perdue*, 438 F. Supp. 3d 546 (D. Md. 2020) .........................13

*Da Costa v. Immigr. Inv'r Program Off.*, 80 F.4th 330 (D.C. Cir. 2023)......................................23

*Doan v. Bergeron*, No. 15-CV-11725-IT, 2016 WL 5346936 (D. Mass. Sept. 23, 2016).........8, 21

*Duarte v. Mayorkas*, No. C 12-03647 RS, 2012 WL 12884630 (N.D. Cal. Aug. 21, 2012)...........................................................................................................................15

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) ..............................................................18

*Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74 (D.D.C. 2025) ....................................................26

*Franchetti ex rel. United States v. Cognizant Tech. Sols. Corp.*, No. CV 17-6317, 2025 WL 1557034 (D.N.J. May 30, 2025)..............................................................................17

*Friends of Cap. Crescent Trail v. U.S. Army Corps of Eng'rs*, 453 F. Supp. 3d 804 (D. Md. 2020).........................................................................................................................14

*Gonzalez v. Cuccinelli*, 985 F.3d 357 (4th Cir. 2021) ......................................................22, 24, 25

*Hazlehurst v. CDC*, No. 1:17-CV-02095, 2017 WL 3037808 (W.D. Tenn. July 18, 2017)................................................................................................................... 13

*Humane Soc'y of the U.S. v. U.S. Postal Serv.*, 609 F. Supp. 2d 85 (D.D.C. 2009)...................... 16

*In re Subpoena to NSF OIG*, No. 3:18-MC-00006-JAG, 2018 WL 5017612 (E.D. Va. Oct. 16, 2018) ..................................................................................................... passim

*Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795 (D.C. Cir. 1983).................... 21

*J.E.C.M. ex rel. Saravia v. Lloyd*, 352 F. Supp. 3d 559 (E.D. Va. 2018) ..................................... 17

*Jake's Fireworks v. U.S. Consumer Prod. Safety Comm'n*, 498 F. Supp. 3d 792 (D. Md. 2020) ................................................................................................................ 15

*Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183 (10th Cir. 2014) ............................. 3

*Lamb v. Wallace*, No. 16-cv-44, 2018 WL 847242 (E.D.N.C. Feb. 13, 2018) ................... 3, 18, 19

*Martin v. O'Rourke*, 891 F.3d 1338 (Fed. Cir. 2018).................................................................... 23

*Maryland v. Corp. for Nat'l & Cmty. Serv.*, 785 F. Supp. 3d 68 (D. Md. 2025).......................... 17

*Mashpee Wampanoag Tribal Council v. Norton*, 336 F.3d 1094 (D.C. Cir. 2003)....................... 23

*Megaro v. McCollum*, 66 F.4th 151 (4th Cir. 2023)...................................................................... 13

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ......................................................................................................................... 18, 19

*Nat'l Urb. League v. Ross*, 977 F.3d 770 (9th Cir. 2020) .............................................................. 21

*Nebraska v. Su*, 121 F.4th 1 (9th Cir. 2024).................................................................................. 21

*OhioHealth Corp. v. U.S. Dep't of Veteran Affairs*, No. 2:14-CV-292, 2014 WL 4660092 (S.D. Ohio Sept. 17, 2014) ................................................................... 13, 17

*Pub. Citizen Health Research Grp. v. Comm'r, FDA*, 740 F.2d 21 (D.C. Cir. 1984).................... 24

*Pueblo of Santa Ana v. Nash*, 854 F. Supp. 2d 1128 (D.N.M. 2012)........................................... 19

*Rhoads v. U.S. Dep't of Veterans Affs.*, 242 F. Supp. 3d 985 (E.D. Cal. 2017)......................... 3, 16

*RLI Ins. Co.*, 2020 WL 1496466, at *3 n.5 ............................................................................. 16, 17

*Sackett v. EPA*, 566 U.S. 120 (2012)............................................................................................ 15

*Sawahreh v. U.S. Dep't of State*, 630 F. Supp. 3d 155 (D.D.C. 2022) ......................................... 23

*Schroeder v. U.S. Dep't of Veterans Affs.*, 673 F. Supp. 3d 1204 (D. Kan. 2023)..................... 3, 17

*SEC v. Richman*, No. 21- CV-01911-CRB(LB), 2021 WL 4951484 (N.D. Cal. Oct. 25, 2021)............................................................................................................................. 20

*Sierra Club v. W. Va. Dep't of Envtl. Prot.*, 64 F.4th 487 (4th Cir. 2023) .................................... 15

*Smith v. FBI*, No. CV 25-12-BAH, 2026 WL 91607 (D. Md. Jan. 13, 2026)..................... 3, 13, 17

*Spence v. NCI Info. Sys.*, 530 F. Supp. 2d 739 (D. Md. 2008) ...................................................... 16

*Telecommunications Research & Action Center v. FCC*, 750 F.2d 70 (D.C. Cir. 1984)......................................................................................................... 22, 23, 24, 25

*Tri-City R.R. Co. v. Preferred Freezer Servs. of Richland*, No. 2:19-CV-00045-SAB, 2020 WL 533143 (E.D. Wash. Feb. 3, 2020) ............................................................ 21

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016).................................................. 16

*United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951) ............................................................ 1

*United States v. Fleet Mgmt.*, No. CRIM. 07-279, 2008 WL 1848102 (E.D. Pa. Apr. 24, 2008)......................................................................................................................... 19

*United States v. Fowler*, 58 F.4th 142 (4th Cir. 2023) .................................................................. 13

*United States v. Oregon*, No. 6:25-CV-01666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026)......................................................................................................................... 26

*Westchester Gen. Hosp. v. Dep't of Health & Hum. Servs.*, 770 F. Supp. 2d 1286 (S.D. Fla.) ........................................................................................................................... 13

*Yousuf v. Samantar*, 451 F.3d 248 (D.C. Cir. 2006) ................................................................ 14, 15

**Statutes and Regulations**

5 U.S.C. § 706........................................................................................................................... passim

5 U.S.C. § 706(2)(A).................................................................................................................. 17, 22

5 U.S.C. §§ 551–559, 701–706........................................................................................................ 12

6 C.F.R. § 5.41(a)(2) ..................................................................................................................... 1, 8

6 C.F.R. § 5.41(b)............................................................................................................................... 1

6 C.F.R. § 5.43 ................................................................................................................................... 8

6 C.F.R. § 5.45(a) .............................................................................................................. 2, 9

6 C.F.R. § 5.48 ...................................................................................................................... 2

6 C.F.R. § 5.48(a) ..............................................................................................11, 16, 17, 18

6 C.F.R. § 5.48(a)(1) .......................................................................................................... 16

6 C.F.R. § 5.48(a)(3) .......................................................................................................... 18

8 C.F.R. § 100.1 .................................................................................................................... 1

H.B. 16, 2021 Leg., 443rd Sess., 2021 Md. Laws ch. 19 ................................................. 5

Md. Code Ann., State Gov't § 20-1044(b) ........................................................................ 8

Md. Code Ann., State Gov't § 6-106.1(b)(1) ..................................................................... 8

Pub. L. 119-21, §§ 90003 & 100052, 139 Stat. 358, 388 (July 4, 2025) ...................... 25

**Miscellaneous**

Bill Chappell, *How ICE grew to be the highest-funded U.S. law enforcement agency*, NPR (Jan. 21, 2026 5:00 AM), https://www.npr.org/2026/01/21/nx-s1-5674887/ice-budget-funding-congress-trump [https://perma.cc/9M2Q-3ALD] ........................................... 25

ICE, *Detention Management* (Feb. 12, 2026), https://www.ice.gov/detain/detention-management [https://perma.cc/B7RS-5FFH] .............................................................. 18

ICE, Enforcement Removal Operations (ERO), Directive 11087.2, *Operations of ERO Holding Facilities* § 3.2 (2024), https://www.ice.gov/doclib/foia/policy/directive11087.2.pdf [https://perma.cc/Z5Q9-CDZT]. ................................................................................ 3

John-John Williams IV & Daniel Zawodny, *'It's scary right now': ICE holds detainees for days in bedless Baltimore cells*, Balt. Banner (Mar. 14, 2025, 5:30 AM), https://www.thebanner.com/politics-power/state-government/ice-baltimore-trump-immigration-deportation-detention-WNRGQUGLTVHD3MBFV4QUMEKDYM/ [https://perma.cc/QD6E-4MJY] ..................... 5

John-John Williams IV et al., *Viral video provides rare look inside crowded ICE holding room in Baltimore*, Balt. Banner (Jan. 27, 2026, 5:30 AM), https://www.thebanner.com/politics-power/national-politics/viral-video-baltimore-ice-holding-room-immigrants-DWH3RIXO45CDRGZDZA4QPA3JNQ/ [https://perma.cc/67SD-N2BD] ............................................................................... 5

Madeleine O'Neill, *Feds: ICE temporarily shut down Baltimore holding facility to comply with court order*, Balt. Banner (Mar. 20, 2026, 11:23 AM), https://www.thebanner.com/politics-power/national-politics/ice-baltimore-holding-

rooms-temporary-shutdown-TQOLITXHDRDWXNQNZM54POPNVM/
[https://perma.cc/8QMM-VBT3] ................................................................................... 7

**INTRODUCTION**

Plaintiff State of Maryland filed this action to obtain documents and official records from U.S. Immigration and Customs Enforcement (ICE) and the Department of Homeland Security (DHS) (together, Defendants), which the Office of the Attorney General (OAG) sought in connection with an investigation into ICE's treatment of immigration detainees at the George H. Fallon Federal Building in Baltimore, Maryland. OAG served an administrative subpoena and filed a *Touhy* request as required by DHS regulations, but Defendants refused to comply. Plaintiff now moves for summary judgment and respectfully seeks entry of an order that declares Defendants' denial of OAG's subpoena and *Touhy* request was contrary to law, arbitrary and capricious, or (in the alternative) unreasonably delayed; vacates Defendants' decision; and orders Defendants to produce the requested documents without delay.

**BACKGROUND**

**I.      Legal Background**

*Touhy* regulations—named after *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951)—are "[h]ousekeeping regulations that create agency procedures for responding to subpoenas." *COMSAT Corp. v. NSF*, 190 F.3d 269, 272 n.3 (4th Cir. 1999). DHS has promulgated *Touhy* regulations at 6 C.F.R. §§ 5.41–5.49, which apply to ICE because ICE is a "component of [DHS]." *See* 6 C.F.R. § 5.41(b); 8 C.F.R. § 100.1; *City of Pembroke Pines v. U.S. Immigr. & Customs Enf't*, 141 F. Supp. 3d 1330, 1333 (S.D. Fla. 2015). DHS's regulations establish procedures to be followed with respect to certain requests for document production, including those issued "pursuant to . . . applicable state rules." 6 C.F.R. § 5.41(a)(2).

"If official information is sought . . . by a request or demand," then the regulations require that "the party seeking such release . . . set forth in writing, and with as much specificity as

possible, the nature and relevance of the official information sought." *Id.* § 5.45(a). "In deciding whether to comply with a demand or request, [DHS] officials and attorneys shall consider, among any other pertinent considerations," the following eight factors:

> (1) Whether such compliance would be unduly burdensome or otherwise inappropriate under the applicable rules of discovery or the rules of procedure governing the case or matter in which the demand arose;

> (2) Whether compliance is appropriate under the relevant substantive law concerning privilege or disclosure of information;

> (3) The public interest;

> (4) The need to conserve the time of [DHS] employees for the conduct of official business;

> (5) The need to avoid spending the time and money of the United States for private purposes;

> (6) The need to maintain impartiality between private litigants in cases where a substantial government interest is not implicated;

> (7) Whether compliance would have an adverse effect on performance by [DHS] of its mission and duties; and

> (8) The need to avoid involving [DHS] in controversial issues not related to its mission.

*Id.* § 5.48.

"[L]itigants who are dissatisfied with an agency's response to a third-party subpoena . . . may [ ] obtain federal court review under the APA." *COMSAT Corp.*, 190 F.3d at 278. "The APA . . . permits a federal court to order a non-party agency to comply with a subpoena if the government has refused production in an arbitrary, capricious, or otherwise unlawful manner." *Id.* at 277. To be sustained under the APA, "an agency's decision to not comply with a subpoena" must be "reasonable" and reached "in accordance with [its] *Touhy* regulations." *Andreas-Myers v. NASA*, No. GJH-16-3410, 2017 WL 1632410, at *7 (D. Md. Apr. 28, 2017) (collecting cases);

*see also COMSAT*, 190 F.3d at 277; *Smith v. FBI*, No. CV 25-12-BAH, 2026 WL 91607, at \*12 (D. Md. Jan. 13, 2026).  The agency must "appropriately consider[ ] relevant factors, as outlined in its internal regulations, and provide[ ] a rational basis for its decision."  *Andreas-Myers*, 2017 WL 1632410, at \*8.

Courts have deemed subpoena responses to violate the APA when the agency "did not properly consider and apply its own *Touhy* regulation factors," *Rhoads v. U.S. Dep't of Veterans Affs.*, 242 F. Supp. 3d 985, 995 (E.D. Cal. 2017), or when "the administrative record fails to demonstrate 'a rational connection between the facts found and the decision made.'"  *Schroeder v. U.S. Dep't of Veterans Affs.*, 673 F. Supp. 3d 1204, 1220 (D. Kan. 2023) (quoting *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1197 (10th Cir. 2014)); *see also In re Subpoena to NSF OIG*, No. 3:18-MC-00006-JAG, 2018 WL 5017612, at \*4 (E.D. Va. Oct. 16, 2018) (holding that agency "abused its discretion in refusing to comply with the movants' subpoena . . . because its decision 'failed to consider important aspects of the dispute, runs counter to the evidence presented, and misapplied [the agency's] *Touhy* regulations'") (quoting *Lamb v. Wallace*, No. 16-cv-44, 2018 WL 847242, at \*6 (E.D.N.C. Feb. 13, 2018)).

## II.    Factual Background

### A.  OAG investigation of ICE hold rooms in the Fallon Federal Building

In late January 2026, OAG opened an investigation into conditions of confinement at the short-term holding facility[1] operated by ICE at the Fallon Federal Building.  The holding facility

---

[1] ICE defines a "holding facility" as "a facility that contains hold rooms that are primarily used for the short-term confinement of individuals who have recently been detained, or are being transferred to or from a court, detention facility, other holding facility, or other agency."  ICE, Enforcement Removal Operations (ERO), Directive 11087.2, *Operations of ERO Holding Facilities* § 3.2 (2024), https://www.ice.gov/doclib/foia/policy/directive11087.2.pdf [https://perma.cc/Z5Q9-CDZT].

consists of five hold rooms[2] with a combined size of 1,728 square feet—the equivalent of a volleyball court. *See* Ex. A to Compl., ECF 1-1, at 5 [Defs.' Suppl. Response to Interrogatories, *D.N.N. v. Liggins*, No. 1:25-cv-01613-JRR, ECF 127-9 (Dec. 23, 2025)]. The hold rooms are temporary holding rooms in a federal office building, designed only for short-term[3] detention of a limited number of people. Each room includes only one public toilet and lacks showers or adequate facilities for sleeping or medical care. *See* Ex. K to Compl., ECF 1-11, at 52 [Mem. Op., *D.N.N.*, No. 1:25-cv-01613-JRR, ECF 170 (D. Md. Mar. 6, 2026)]. Although the hold rooms are only intended to hold a maximum of 56 people, *see* Ex. B to Compl., ECF 1-2, at 2 [Memorandum from Nikita Baker, Deputy Field Office Director, ERO Baltimore, to ICE Unit Chief, Detention Oversight Unit, Oversight, Compliance and Acquisition Division (Feb. 9, 2025), *D.N.N.*, No. 1:25-cv-01613-JRR, ECF 127-3 (D. Md. Dec. 23, 2025)], this Court recently found that "ICE routinely exceeds the maximum capacity of 56 individuals," and has, in fact, "detained more than 120 individuals . . . in one day." Mem. Op., Ex. K to Compl., ECF 1-11, at 51.

---

[2] ICE defines a "hold room" as a "holding cell, cell block, or other secure enclosure within a holding facility." *Id.* § 3.3. Plaintiff uses the term "hold room" to refer to formally designated "hold rooms," as well as any other similar temporary detention facility in the Fallon Federal Building used to detain individuals in ICE custody.

[3] ICE defines "short-term" as "a period not to exceed 12 hours, absent exceptional circumstances." ICE, ERO, Directive 11087.2, § 3.2 n.3. On February 5, 2025, the Baltimore Field Office received a waiver to detain individuals for up to 48 hours. *See* Ex. C to Compl., ECF 1-3, at 2 [Memorandum from Nikita Baker, Deputy Field Office Director, ERO Baltimore, to Monica Burke, Assistant Director, Custody Management, to All ERO Field Office Directors (Jan. 30, 2025), *D.N.N.*, No. 1:25-cv-01613-JRR, ECF 40-2 (D. Md. June 30, 2025)] ('Baltimore Waiver Mem.'). On June 24, 2025, ERO issued a nationwide waiver to all ICE holding facilities to allow for noncitizens to be held for up to 72 hours, absent exceptional circumstances. *See* Ex. D to Compl., ECF 1-4, at 2 [Memorandum from Monica Burke, Assistant Director, Custody Management, to All ERO Field Office Directors (June 24, 2025), *D.N.N.*, No. 1:25-cv-01613-JRR, ECF 40-3 (D. Md. June 30, 2025)] ('Nationwide Waiver Mem.').

OAG opened its investigation into the hold rooms in response to reports of overcrowding, lengthy detentions, and failures to provide medical attention, sufficient food and water, adequate sleep environment, and access to hygienic and sanitary conditions and legal counsel.  News stories about overcrowding, extended lengths of detention, and other alarming conditions in the ICE hold rooms have appeared since March 2025.[4]  *See, e.g.*, John-John Williams IV & Daniel Zawodny, *'It's scary right now': ICE holds detainees for days in bedless Baltimore cells*, Balt. Banner (Mar. 14, 2025, 5:30 AM), https://www.thebanner.com/politics-power/state-government/ice-baltimore-trump-immigration-deportation-detention-WNRGQUGLTVHD3MBFV4QUMEKDYM/ [https://perma.cc/QD6E-4MJY].  In late January 2026, a video circulating online showed numerous people detained in the Baltimore hold rooms, who stated that they had been detained for ten days, assaulted, and denied food and proper hygiene.  *See* John-John Williams IV et al., *Viral video provides rare look inside crowded ICE holding room in Baltimore*, Balt. Banner (Jan. 27, 2026, 5:30 AM), https://www.thebanner.com/politics-power/national-politics/viral-video-baltimore-ice-holding-room-immigrants-DWH3RIXO45CDRGZDZA4QPA3JNQ/ [https://perma.cc/67SD-N2BD]; Ex. E to Compl., ECF 1-5 [Transcript of Video from the

---

[4]  ICE has indicated that these conditions resulted from the administration's increased immigration-enforcement efforts, which have strained existing, limited detention capacity.  *See* Baltimore Waiver Mem., Ex. C to Compl., ECF 1-3, at 1 (noting that "[a]n increased nationwide operating posture has been implemented making detention space less readily available"); Nationwide Waiver Mem., Ex. D to Compl., ECF 1-4, at 1 (describing how "[a]s a result of increased enforcement efforts, ERO's average daily population has significantly increased to over 54,000" and that because "field offices no longer have the option to discretionarily release [noncitizens] aliens, nor decline to take [noncitizens] into custody from counterparts" in Homeland Security Investigations or U.S. Customs and Border Protection "field offices have had to resort to holding aliens in holding facilities beyond . . . the 12-hour limit").  ICE also has blamed Maryland's Dignity Not Detention Act, *see* Baltimore Waiver Mem., Ex. C to Compl., ECF 1-3, at 1, which limited the availability of detention space by, among other things, prohibiting State and local governments from entering into immigration detention agreements or "facilitating immigration-related detention by private entities."  H.B. 16, 2021 Leg., 443rd Sess., 2021 Md. Laws ch. 19.

Baltimore Hold Room, *D.N.N.*, No. 1:25-cv-01613-JRR, ECF 129-1 (D. Md. Jan. 26, 2026)]; *see* Ex. L to Compl., ECF 1-11, at 12 & n.14.

Earlier this month, this Court assessed conditions in the Baltimore hold rooms and entered a preliminary injunction in favor of a class of detainees held there. Ex. L to Compl., ECF 1-12, [Order, *D.N.N.*, No. 1:25-cv-01613-JRR, ECF 171 (D. Md. Mar. 6, 2026)]. This Court preliminarily found that—

- Individuals detained in the Baltimore Hold Room are routinely held there overnight and in excess of 12 hours.

- Individuals detained in the Baltimore Hold Rooms are often held there for more than 72 hours.

- ICE routinely exceeds the maximum capacity of 56 individuals in the Baltimore Hold Rooms, and has detained more than 120 individuals in the Baltimore Hold Rooms in one day, which is over 200% of its maximum capacity.

- ICE routinely exceeds its own unofficially-assigned maximum capacity of 35 individuals in a larger cell at one time.

- Individuals detained in the Baltimore Hold Rooms are not able to bathe or shower.

- Individuals detained in the Baltimore Hold Rooms are routinely required to use the toilet with minimal or no privacy.

- Individuals detained in the Baltimore Hold Rooms are routinely subjected to unsanitary environments, including unclean cells and toilets.

- Individuals detained in the Baltimore Hold Rooms are not provided access to clean clothes or basic hygiene items on a routine basis; sometimes not at all.

- Individuals detained in the Baltimore Hold Rooms are routinely denied their medications or medical care, or not provided necessary access to same.

- ICE does not screen for medical needs of individuals detained in the Baltimore Hold Rooms.

6

Mem. Op., Ex. K to Compl., ECF 1-11, at 51.  Based on those findings, this Court held that the *D.N.N.* plaintiffs "ma[de] a clear showing that they are likely to succeed in showing that Defendants deprive individuals detained in the Baltimore Hold Rooms of hygienic, sanitary, and safe conditions, as well as basic medical screening and care, in violation of their rights guaranteed by the Fifth Amendment to the United States Constitution." *Id.* at 63.  This Court enjoined ICE from detaining persons in the hold rooms "without adequate medical care and screening" or without meeting minimum standards for personal space and hygiene.  Order, Ex. L to Compl., ECF 1-12, at 2–3.  According to ICE, it initially responded by transferring detainees from the Fallon Federal Building to facilities in other States, but it has since resumed detaining people in the hold rooms.  *See* Madeleine O'Neill, *Feds: ICE temporarily shut down Baltimore holding facility to comply with court order*, Balt. Banner (Mar. 20, 2026, 11:23 AM), https://www.thebanner.com/politics-power/national-politics/ice-baltimore-holding-rooms-temporary-shutdown-TQOLITXHDRDWXNQNZM54POPNVM/   [https://perma.cc/8QMM-VBT3].

In its investigation, OAG has learned of additional allegations regarding ICE's conduct that were not raised in the *D.N.N.* litigation.  For example, OAG learned of an individual who, after experiencing a health crisis, allegedly waived their legal rights against deportation in order to receive medical care outside the United States.  *See* Ex. P. to Compl., ECF 1-16, at 2–3 [Letter from Jonathan Smith and Adam Kirschner, Assistant Attorneys General, OAG to Rachel Knight, Associate Legal Advisor, U.S. ICE (Feb. 27, 2026)] ('OAG Response').  OAG has invited members of the public with information about conditions in ICE detention facilities in Maryland to contact OAG at Immigration.Detention@oag.maryland.gov.

### B.  OAG administrative subpoena and Touhy letter

OAG's investigation, which is being conducted jointly by OAG's Civil Rights Division and Federal Accountability Unit, seeks to discover whether DHS and ICE are engaging in a pattern or practice of civil rights violations by subjecting noncitizens to unconstitutional conditions in the Baltimore hold rooms.  Consistent with standard practice in civil rights investigations, on January 30, 2026, OAG sent an administrative subpoena for documents to the targets of its investigation— DHS and ICE.  *See* Ex. M to Compl., ECF 1-13 [OAG *Touhy* Letter and Administrative Subpoena (Jan. 30, 2026)].  OAG issued the subpoena pursuant to State law authorizing the request for documents in connection with an investigation of civil rights violations, including whether persons are being denied basic constitutional rights based on their national origin, race, or ethnicity.  Md. Code Ann., State Gov't § 20-1044(b); *see also id.* § 6-106.1(b)(1) ("[T]he Attorney General may investigate, commence, and prosecute or defend any civil or criminal suit or action that is based on the federal government's action or inaction that threatens the public interest and welfare of the residents of the State with respect to . . . (i) protecting the health of the residents of the State and ensuring the availability of affordable healthcare . . . (iii) protecting civil liberties . . . (viii) protecting the residents of the State against illegal and unconstitutional federal immigration and travel restrictions . . . (xiii) otherwise protecting, as parens patriae, the State's interest in the general health and wellbeing of its residents.").  The subpoena includes nine specific, time-limited requests for documents.  *See* OAG *Touhy* Letter, Ex. M to Compl., ECF 1-13, at 16–17.

OAG served the subpoena on DHS's Office of the General Counsel (OGC) and ICE's Office of the Principal Legal Advisor (OPLA) under DHS's *Touhy* regulations.  *See* 6 C.F.R. § 5.43. "DHS'[s] *Touhy* regulations specifically recognize . . . that a demand for information from the agency may be made by a subpoena," *Doan v. Bergeron*, No. 15-CV-11725-IT, 2016 WL 5346936, at *1 (D. Mass. Sept. 23, 2016); *see* 6 C.F.R. § 5.41(a)(2) (DHS's *Touhy* regulations

8

govern "response[s] to subpoenas, orders, or other requests or demands of federal or state judicial or quasi-judicial or administrative authority," as well as "response[s] to requests for . . . document production . . . pursuant to the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure, or applicable state rules"), and require the party requesting the information to "set forth in writing, and with as much specificity as possible, the nature and relevance of the official information sought." *Id.* § 5.45(a). Accordingly, along with the subpoena, OAG sent DHS and ICE a letter describing the information sought and explaining its relevance to OAG's investigation. *See* OAG *Touhy* Letter, Ex. M to Compl., ECF 1-13, at 4–9.

The materials OAG sought fell largely in three categories. First, OAG sought information about conditions in the hold rooms, specifically, overcrowding, lengthy detentions, and other mistreatment (i.e., failure to provide medical attention, failure to provide sufficient food and water, failure to provide an adequate sleep environment, failure to provide access to hygienic and sanitary conditions, and failure to provide access to legal counsel). That information is "relevant to the alleged injuries which threaten the public interest and welfare of Maryland residents and therefore form the basis of OAG's investigation." *Id.* at 5. Second, OAG sought information about the demographics of those detained in the hold rooms, which is relevant to whether ICE is "[s]ubjecting individuals to unequal treatment and/or treatment in violation of constitutional protections and other standard detention practices on the basis of protected characteristics, including national origin." *Id.* at 6. Third, OAG sought information regarding the legal bases for detainees' arrest and detention. That information is "relevant to OAG's investigation of potential civil rights violations, including due process and equal protection violations," because "individuals [may] have been subject to the overcrowding and other conditions . . . because they have been

9

denied due process protections (e.g., access to legal counsel, right to individualized determinations of danger or flight risk)" on the basis of protected characteristics. *Id.* at 7–8.

Given the alarming nature of the allegations described in the *Touhy* letter, OAG requested a formal response to its *Touhy* request within 14 days, that is, no later than February 13, 2026. *Id.* at 1. The administrative subpoena also included a response date of February 13, 2026. *Id.* at 11.

### C. ICE denial of OAG's Touhy request

DHS OGC and ICE OPLA received OAG's subpoena and *Touhy* letter on or about January 30, 2026. *See* Ex. N to Compl., ECF 1-14 [Letter from Rachel Knight, Associate Legal Advisor, U.S. ICE, to Jonathan M. Smith, Assistant Attorney General, OAG at 2 (Feb. 25, 2026)] ('ICE *Touhy* Response'). On February 12, 2026, an attorney from ICE OPLA e-mailed OAG counsel confirming receipt of the letter and subpoena, acknowledging the February 13 response deadline, and requesting "a brief extension" to February 20. Ex. O to Compl., ECF 1-15, at 6–7 [Email from Angela M. Fiorentino-Rios to Yasmin Dagne et al. (Feb. 12, 2026)]. That same day, OAG counsel agreed to the one-week extension, explaining that OAG expected to receive a response on or before February 20. *Id.* at 6. An ICE OPLA attorney responded, acknowledging the extension. *Id.* at 5.

On February 20, 2026, ICE OPLA attorneys did not provide any response, so the next day, OAG counsel e-mailed ICE OPLA attorneys for an update. Ex. O to Compl., ECF 1-15, at 4 [Email from Yasmin Dagne to Angela M. Fiorentino-Rios et al. (Feb. 20, 2026)]. OAG did not hear from ICE OPLA until five days after the agreed-upon response deadline. *See id.* at 3–4. On February 25, 2026—nearly four weeks after OAG issued its subpoena and *Touhy* letter—ICE denied OAG's *Touhy* request in full, stating "your request for the production of documents is denied pursuant to the DHS *Touhy* regulations." ICE *Touhy* Response, Ex. N to Compl., ECF 1-14, at 2.

In denying OAG's request, ICE relied on three general objections: (1) that the requests are overly broad, (2) that the requests are unduly burdensome, and (3) that the requested information implicates privacy protections. ICE also objected that certain requests do not seek relevant information. ICE did not cite the 6 C.F.R. § 5.48 factors it is required to consider in responding to a *Touhy* request, did not specifically address how the requests were overly broad or unduly burdensome, and did not offer to provide any documents that were redacted to remove private information. To the contrary, ICE suggested that any attempt to "modif[y] [OAG's requests] to appropriately narrow and identify the information sought" would be futile because "the information requested would still likely be unduly burdensome and duplicative" and its disclosure "would violate the Privacy Act of 1974 . . . or otherwise cause an unwarranted invasion of personal privacy." ICE *Touhy* Response, Ex. N to Compl., ECF 1-14, at 7.

On February 27, 2026, OAG provided ICE a letter in response detailing numerous deficiencies in its denial of OAG's *Touhy* request. *See* OAG Response, Ex. P to Compl., ECF 1-16. In the letter, OAG raised five deficiencies:

    a. First, ICE's denial did not identify or adequately address the factors ICE is required to consider "[i]n deciding whether to comply with a [*Touhy*] demand or request," 6 C.F.R. § 5.48(a);

    b. Second, ICE provided little to no explanation for its objections that requests are "overly broad" (even as it objected to all nine requests on that basis);

    c. Third, ICE's objection that requests are "unduly burdensome" appears to have been premised on the factually incorrect assertion that the requests are "duplicative" of materials exchanged in *D.N.N.* and the legally incorrect assertion that Plaintiff could obtain requested documents through the *D.N.N.* litigation, even though

Plaintiff is not a party to that litigation and confidential material are protected from disclosure pursuant to a court order;

d.  Fourth, ICE mistakenly invoked privacy concerns to object to certain requests that do not seek protected information, and to the extent that requested documents implicate privacy concerns, did not offer to redact or otherwise anonymize protected information; and

e.  Fifth, ICE's denial ignored OAG's detailed, written explanation of how the documents sought are relevant to OAG's investigation.

OAG requested that ICE respond within one week, or by March 6, 2026.

In a one-paragraph email on March 6, ICE said that it "need[ed] additional time to confer internally to determine if [the agency] can implement reasonable parameters to sharing information responsive to your *Touhy* request and administrative subpoena." Ex. O to Compl., ECF 1-15, at 2 [Email from Rachel Knight to Yasmin Dagne et al. (Mar. 6, 2026)]. It indicated that it "should be able to provide a further response by Monday, April 6, 2026." *Id.* ICE did not substantively respond to any of the points raised in OAG's February 27 letter.

OAG replied the same day: "It has now been five weeks since we initially served our *Touhy* request. As we have detailed, however, this matter is of great urgency. We do not consider a monthlong delay to decide whether you 'can' produce anything to be reasonable or consistent with your *Touhy* obligations." *Id.* at 1. ICE responded only that "it will stay focused on resolving this matter as soon as possible," with no further elaboration. *Id.*

## **STANDARD OF REVIEW**

The APA, 5 U.S.C. §§ 551–559, 701–706, "permits a federal court to order a non-party agency to comply with a subpoena if the government has refused production in an arbitrary,

capricious, or otherwise unlawful manner." *COMSAT Corp.*, 190 F.3d at 277. "In a case involving review of a final agency action under the APA, . . . [s]ummary judgment [ ] serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record[5] and is otherwise consistent with the APA standard of review." *Ctr. for Sci. in the Pub. Interest v. Perdue*, 438 F. Supp. 3d 546, 556–57 (D. Md. 2020). The Court must examine the record and decide whether the "agency's decision to not comply with a subpoena" was "reasonable" and reached "in accordance with [its] *Touhy* regulations." *Andreas-Myers*, 2017 WL 1632410, at *7 (collecting cases); *see also COMSAT*, 190 F.3d at 277; *Smith v. FBI*, 2026 WL 91607, at *12. The agency must have "appropriately considered relevant factors, as outlined in its internal regulations, and provided a rational basis for its decision." *Andreas-Myers*, 2017 WL 1632410, at *8. If the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," then "summary judgment should be granted." *Friends of Cap.*

---

5    In this *Touhy* case, because Defendants refused to produce any documents, "the administrative record . . . consists only of the request and denial letters." *Westchester Gen. Hosp. v. Dep't of Health & Hum. Servs.*, 770 F. Supp. 2d 1286, 1297 (S.D. Fla.), *aff'd mem.*, 443 F. App'x 407 (11th Cir. 2011) (per curiam); *accord Hazlehurst v. CDC*, No. 1:17-CV-02095, 2017 WL 3037808, at *3 (W.D. Tenn. July 18, 2017); *OhioHealth Corp. v. U.S. Dep't of Veteran Affs.*, No. 2:14-CV-292, 2014 WL 4660092, at *4 (S.D. Ohio Sept. 17, 2014); *CCA of Tenn. v. Dep't of Veterans Affs.*, No. 09-CV-2442, 2010 WL 1734953, at *8 (S.D. Cal. Apr. 27, 2010). Plaintiff attached those documents as exhibits to the Complaint. *See* OAG *Touhy* Letter, Ex. M to Compl., ECF 1-13; ICE *Touhy* Response, Ex. N to Compl., ECF 1-14; Email Correspondence, Ex. O to Compl., ECF 1-15; OAG Response, Ex. P to Compl., ECF 1-16. The remaining exhibits consist of this Court's ruling in the *D.N.N.* case and other public filings that were referenced in the communications between OAG and ICE. *See Megaro v. McCollum*, 66 F.4th 151, 157 (4th Cir. 2023) ("[A] court may properly take judicial notice of matters of public record[.]"); *United States v. Fowler*, 58 F.4th 142, 152 (4th Cir. 2023) ("[T]he 'most frequent use of judicial notice of ascertainable facts is in noticing the content of court records.'") (quoting *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989)). Thus, for purposes of this motion, the Court may treat the exhibits to the complaint as commensurate with the administrative record.

13

*Crescent Trail v. U.S. Army Corps of Eng'rs*, 453 F. Supp. 3d 804, 812 (D. Md. 2020) (quoting Fed. R. Civ. P. 56(a)), *aff'd mem.*, 855 F. App'x 121 (4th Cir. 2021).

## ARGUMENT

**I.    ICE's Denial of Plaintiff's *Touhy* Request and Administrative Subpoena Is Contrary to Law and Arbitrary and Capricious.**

ICE's denial of OAG's *Touhy* request on February 25 was a final agency action that was both contrary to law and arbitrary and capricious under the APA. Accordingly, Plaintiff moves for summary judgment on Counts I and II of their Complaint and ask that this Court vacate and set aside ICE's denial and order Defendants to produce the requested documents. *See* 5 U.S.C. § 706.

**A. ICE's Denial of Plaintiff's *Touhy* Request and Administrative Subpoena Is Final Agency Action.**

ICE's February 25 response to OAG's *Touhy* request—which "advised [OAG] in writing that the agency would not produce the materials demanded"—"was a final agency action that is ripe for [this Court's] review under the APA." *COMSAT Corp.*, 190 F.3d at 274–75. "[A]n agency action may be considered 'final' only when the action signals the consummation of an agency's decisionmaking process *and* gives rise to legal rights or consequences." *Id.* at 274. "The requirement that an agency's action be 'final' prevents improper judicial intrusion into the administrative decisionmaking process." *Yousuf v. Samantar*, 451 F.3d 248, 251 (D.C. Cir. 2006). Here, "that process was completed," *see id.*, when ICE told OAG that its "request for the production of documents is denied," objected to the requests (albeit in boilerplate terms), and asserted that "the information requested would still likely be unduly burdensome and duplicative" even if OAG modified the request. ICE *Touhy* Response, Ex. N to Compl., ECF 1-14, at 2, 4–7. ICE's refusal was definitive, not "tentative," and it had "direct and appreciable legal consequences" by preventing OAG from obtaining the documents. *See Bennett v. Spear*, 520 U.S.

14

154, 178 (1997).  Thus, "[ICE's] denial of [OAG's] request is final agency action."  *See Yousuf*, 451 F.3d at 251.

The finality of ICE's decision is not undone by its March 6 request for additional time "to confer internally to determine if [the agency] can implement reasonable parameters to sharing information."  Email from Rachel Knight, Ex. O to Compl., ECF 1-15, at 2.  "While an agency appeals process may render an agency decision not final, the 'mere possibility that an agency might reconsider [its action] . . . does not suffice to make an otherwise final agency action nonfinal.'"  *Sierra Club v. W. Va. Dep't of Envtl. Prot.*, 64 F.4th 487, 499 (4th Cir. 2023) (quoting *Sackett v. EPA*, 566 U.S. 120, 127 (2012)).  Here, there is no "appeal or further review pending," OAG has no "entitlement to further action" from the agency, and ICE has given "no indication that the decision will be revised in the future."  *See Jake's Fireworks v. U.S. Consumer Prod. Safety Comm'n*, 498 F. Supp. 3d 792, 803 (D. Md. 2020).  To the contrary, ICE stated that any modifications to the request would be futile because "the information requested would still likely be unduly burdensome and duplicative."  ICE *Touhy* Response, Ex. N to Compl., ECF 1-14, at 7.

ICE's subsequent request for additional time "to confer internally," Email from Rachel Knight, Ex. O to Compl., ECF 1-15, at 2, "does not undermine the conclusion that [OAG's] denial letter was a final agency action."  *See Am. Bar Ass'n v. U.S. Dep't of Educ.*, 370 F. Supp. 3d 1, 21 (D.D.C. 2019).  "The agency cannot eviscerate the final agency decision requirement by simply stalling," *Duarte v. Mayorkas*, No. C 12-03647 RS, 2012 WL 12884630, at *2 (N.D. Cal. Aug. 21, 2012), *aff'd mem. sub nom. Asparren v. Mayorkas*, 529 F. App'x 826 (9th Cir. 2013) (per curiam), and ICE did not suggest it had reconsidered its decision to deny the request even if OAG "modified" the request to "narrow and identify the information sought."  *See* ICE *Touhy* Response, Ex. N to Compl., ECF 1-14, at 7; *see also Sierra Club*, 64 F.4th at 500 ("When there is no assurance

15

that the Department's decision will be reviewed, it 'for all practical purposes has ruled definitively' on the matter.") (quoting *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016)) (other internal quotation marks omitted); *Humane Soc'y of the U.S. v. U.S. Postal Serv.*, 609 F. Supp. 2d 85, 93 (D.D.C. 2009) (letters were "final agency action" because they "unequivocally state[d] the agency's position" and did not "suggest[ ] that [the agency] would engage in further consideration of the issue without a change of circumstances").

**B. ICE's Denial of Plaintiff's Touhy Request and Administrative Subpoena Is Contrary to Law.**

ICE's refusal to comply with OAG's administrative subpoena is "not in accordance with law" or "without observance of procedure required by law," 5 U.S.C. § 706(2)(A), (D), because the agency "did not properly consider and apply its own *Touhy* regulation factors." *See Rhoads*, 242 F. Supp. 3d at 995. "6 C.F.R. § 5.48(a) requires DHS [and its components] to consider [a list of] enumerated factors" when responding to a *Touhy* request. *RLI Ins. Co.*, 2020 WL 1496466, at *3 n.5; 6 C.F.R. § 5.48(a). In its February 25 response to OAG's subpoena, however, ICE did not identify the enumerated factors under 6 C.F.R. § 5.48(a), and the response makes clear nearly all of those factors were not considered. *Cf. Spence v. NCI Info. Sys.*, 530 F. Supp. 2d 739, 745 (D. Md. 2008) (agency need not "utter some formulaic incantation in order to satisfy the APA" so long as the grounds for denial "may reasonably be discerned"). Instead, ICE relied principally on boilerplate objections, including that the requests were "overly broad, unduly burdensome, and duplicative." *E.g.*, ICE *Touhy* Response, Ex. N to Compl., ECF 1-14, at 4. Even if that objection was intended to address the first regulatory factor—"[w]hether [ ] compliance would be unduly burdensome or otherwise inappropriate under the applicable rules of discovery," 6 C.F.R. § 5.48(a)(1)—ICE's failure to consider the other factors means that its "decision is 'not in

accordance with law' and must be set aside." *See Maryland v. Corp. for Nat'l & Cmty. Serv.*, 785 F. Supp. 3d 68, 111 (D. Md. 2025) (quoting *J.E.C.M. ex rel. Saravia v. Lloyd*, 352 F. Supp. 3d 559, 583 (E.D. Va. 2018)); *Franchetti ex rel. United States v. Cognizant Tech. Sols. Corp.*, No. CV 17-6317, 2025 WL 1557034, at *5 (D.N.J. May 30, 2025) ("Where an administrative decision, purportedly based on a specific regulatory provision, does not comport with that regulation, the decision is 'otherwise not in accordance with law.'") (quoting 5 U.S.C. § 706(2)(A)).

ICE's blanket denial of OAG's *Touhy* request fell far short of the required consideration of applicable regulatory factors. Unlike in other cases where agency denials of *Touhy* requests have been upheld, ICE did not "ma[ke] its denial in accordance with the applicable *Touhy* regulations" or "articulate[ ] reasons . . . that support a finding that it considered the request in the manner required by law." *Cf. Smith*, 2026 WL 91607, at *12. Nor did ICE "describe[ ] in detail the agency's *Touhy* analysis of the costs and benefits associated with producing the subpoenaed documents." *See COMSAT Corp.*, 190 F.3d at 277. Rather, ICE ignored nearly all of the regulatory factors. "By failing to address the [regulatory] factors," ICE "failed 'to address one of the most important aspects of' a *Touhy* request." *Schroeder*, 673 F. Supp. 3d at 1222 (quoting *OhioHealth Corp. v. U.S. Dep't of Veteran Affairs*, No. 2:14-CV-292, 2014 WL 4660092, at *6 (S.D. Ohio Sept. 17, 2014)).

In short, "6 C.F.R. § 5.48(a) *requires* DHS [and its components] to consider the enumerated factors." *RLI Ins. Co.*, 2020 WL 1496466, at *3 n.5 (emphasis added). ICE's failure to consider those factors means that its denial of OAG's subpoena was "not in accordance with law" and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). The Court should declare that ICE's denial of OAG's subpoena was contrary to law under the APA; vacate and set aside the decision; and order DHS and ICE to produce the documents requested.

17

### C. ICE's Denial of Plaintiff's Touhy Request and Administrative Subpoena Is Arbitrary and Capricious.

ICE's refusal to comply with OAG's administrative subpoena is arbitrary and capricious under the APA. An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *see Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency must provide "a satisfactory explanation for its action including a rational connection between the facts found and the choice made") (internal quotation marks omitted). Here, ICE's decision is arbitrary and capricious because ICE "failed to consider important aspects of the dispute," "misapplied [its] *Touhy* regulations," and acted "counter to the evidence presented." *See In re Subpoena to NSF OIG*, 2018 WL 5017612, at *4 (quoting *Lamb*, 2018 WL 847242, at *6).

First, ICE "entirely failed to consider [ ] important aspect[s] of the problem." *See State Farm*, 463 U.S. at 43. ICE did not identify or consider nearly all of the factors required by 6 C.F.R. § 5.48(a).[6] In particular, it never considered "[t]he public interest," *id.* § 5.48(a)(3), even though "an agency official must . . . consider[ ] whether the public interest and the agency's taxpayer-funded mission would be furthered by compliance." *COMSAT Corp.*, 190 F.3d at 277–78. OAG is investigating alleged "constitutional violation[s] of great magnitude" that pertain directly to ICE's mission. *See Lamb*, 2018 WL 847242, at *6; *see also* ICE, *Detention Management* (Feb. 12, 2026), https://www.ice.gov/detain/detention-management [https://perma.cc/B7RS-5FFH] ("[A]ll facilities housing ICE detainees must comply with one of several sets of detention standards

---

[6] ICE's response only appears to reference—in a boilerplate, non-specific way—the first 6 C.F.R. § 5.48(a) factor, "[w]hether such compliance would be unduly burdensome or otherwise inappropriate under the applicable rules of discovery or the rules of procedure governing the case or matter in which the demand arose." *Id.* § 5.48(a)(1); *see* ICE *Touhy* Response, Ex. N to Compl., ECF 1-14, at 4–7.

18

which describe a facility's immigration detention responsibilities, explain what detainee services a facility must provide, and identify what a facility must do to ensure a safe and secure detention environment for staff and aliens in detention[.]"). But ICE "failed to consider . . . the seriousness of the [underlying] action" or its relation to ICE's duties. *See Lamb*, 2018 WL 847242, at *6. "Because the [agency] 'entirely failed to consider an important aspect of the problem,'" it "abused its discretion" in denying OAG's *Touhy* request. *See In re Subpoena to NSF OIG*, 2018 WL 5017612, at *1 (quoting *State Farm*, 463 U.S. at 43).

Second, for the principal factor that it did consider—undue burden—ICE "offered an explanation for its decision that runs counter to the evidence before the agency." *See State Farm*, 463 U.S. at 43. Although ICE alleged that the requests are unduly burdensome, *see* ICE *Touhy* Response, Ex. N to Compl., ECF 1-14, at 4–7, it did not "elaborate further on the purported burden." *United States v. Fleet Mgmt.*, No. CRIM. 07-279, 2008 WL 1848102, at *3 (E.D. Pa. Apr. 24, 2008). The agency's "generalized assertion that [compliance] would be 'overly burdensome'" thus "cannot . . . be a valid exercise of [ICE's] discretion." *See id.*

Moreover, ICE relied in part on an erroneous assertion that some of the requests were "duplicative and thus unduly burdensome" because responsive documents already had been produced in discovery in the *D.N.N.* litigation. *E.g.*, ICE *Touhy* Response, Ex. N to Compl., ECF 1-14, at 4. OAG—a mere amicus curiae— "cannot conduct discovery" in *D.N.N.*, *see Pueblo of Santa Ana v. Nash*, 854 F. Supp. 2d 1128, 1135 (D.N.M. 2012), nor can it readily obtain documents from plaintiffs' counsel due to a stipulated confidentiality agreement and protective order. *See* OAG Response, Ex. P to Compl., ECF 1-16, at 30–31. ICE also did not consider OAG's unique, investigative need to obtain these documents from the custodian of the documents. OAG seeks these documents "directly from the [original custodian] in order to establish the authenticity of the

19

records." *SEC v. Richman*, No. 21- CV-01911-CRB(LB), 2021 WL 4951484, at *2 (N.D. Cal. Oct. 25, 2021). Thus, "the subpoena[ ] [is] not duplicative." *See id.*

Nevertheless, many of the documents sought by OAG's subpoena fall outside the scope of plaintiffs' discovery requests in *D.N.N.*, and ICE did not cite any authority that holds the scope of the State's independent investigation should be limited by what was produced to a private litigant in another lawsuit. For example, OAG's subpoena sought "[a]ll documents related to the use of force against" any detainee in the hold rooms, as well as "[a]ll complaints or grievances" and "any response" to such complaints or grievances concerning the "use of force against detainees," OAG *Touhy* Letter, Ex. M to Compl., ECF 1-13, at 17, whereas plaintiffs' discovery requests in *D.N.N.* did not include any requests concerning use of force, *see* OAG Response, Ex. P to Compl., ECF 1-16, at 25–27. Indeed, none of the *D.N.N.* plaintiffs' claims allege excessive force, and therefore discovery in that case is unlikely to produce documents on this topic of OAG's investigation. *See* Mem. Op., Ex. K to Compl., ECF 1-11, at 2. OAG also sought documents concerning the legal bases for detainees' arrest and detention, OAG *Touhy* Letter, Ex. M to Compl., ECF 1-13, at 18, whereas plaintiffs' discovery requests were focused on the number of detainees in the hold rooms, *see* OAG Response, Ex. P to Compl., ECF 1-16, at 25–27 (requests 2, 3, 4, 6, 10, and 11 seeking documents relating to the "number of" detainees in the hold rooms). Although parties in both matters have sought documents addressing *what* the Baltimore hold room conditions are, the focus and scope are different. And, regardless, OAG also sought documents describing *who* has been detained in these hold rooms and *why* they have been arrested and detained. OAG *Touhy* Letter, Ex. M. to Compl., ECF 1-13, at 5–10; OAG Response, Ex. P to Compl., ECF 1-16, at 5.

Further, to the extent that ICE "already produced" some of the same documents "in response to another lawsuit," that merely means that the request is "*not* unduly burdensome." *See Tri-City*

20

*R.R. Co. v. Preferred Freezer Servs. of Richland*, No. 2:19-CV-00045-SAB, 2020 WL 533143, at *2 (E.D. Wash. Feb. 3, 2020) (emphasis added).  Any (limited) overlap in documents sought confirms that compliance with the subpoena "would have no effect on the economy and efficiency of the [agency]'s operations."  *See In re Subpoena to NSF OIG*, 2018 WL 5017612, at *3.

In any event, ICE failed to consider alternatives to its blanket denial of the *Touhy* request. *See Nebraska v. Su*, 121 F.4th 1, 17 (9th Cir. 2024) ("As the APA requires that agencies engage in reasoned decision making, the agency had an obligation to consider . . . any alternatives, even if it could properly end up rejecting them.") (quoting *Nat'l Urb. League v. Ross*, 977 F.3d 770, 779 (9th Cir. 2020)).  ICE did not, for example, offer to "produce [any] documents it concede[d] are relevant and non-privileged and which may be produced without an undue burden."  *Cf. Doan v. Bergeron*, No. 15-CV-11725-IT, 2016 WL 5346936, at *3 (D. Mass. Sept. 23, 2016) (concluding that "DHS [was] acting arbitrarily in refusing to produce even the concededly relevant information").  Nor did ICE consider whether it could "adequately protect any private information with appropriate redactions."  *See In re Subpoena to NSF OIG*, 2018 WL 5017612, at *3.  Rather, ICE foreclosed any efforts at partial compliance by stating that even if OAG "modif[ied]" and "narrow[ed]" the requests, "the information requested would still likely be unduly burdensome and duplicative."  ICE *Touhy* Response, Ex. N to Compl., ECF 1-14, at 7.  That premature dismissal does not satisfy ICE's "duty . . . to give a reasoned explanation for its rejection of [ ] alternatives."  *See Nebraska v. Su*, 121 F.4th at 17 (quoting *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1169 (D.C. Cir. 1987)).  Therefore, "the [agency]'s failure to consider [ ] alternatives, and to explain why such alternatives were not chosen, was arbitrary and capricious." *See Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 815 (D.C. Cir. 1983).

For all of the aforementioned reasons, ICE's denial of OAG's *Touhy* request was arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A). The Court should declare that ICE's denial of OAG's subpoena was arbitrary and capricious under the APA; vacate and set aside ICE's decision; and order DHS and ICE to produce the documents requested.

**II.      In the Alternative, ICE's Response to Plaintiff's Touhy Request and Administrative Subpoena Is Unreasonably Delayed.**

If the Court disagrees with Plaintiff that ICE's February 25 denial of OAG's *Touhy* request was a final agency action, *cf. COMSAT Corp.*, 190 F.3d at 274–75, then, in the alternative, Plaintiffs move for summary judgment on Count III of their Complaint, seeking to "compel agency action" that has been "unreasonably delayed." *See* 5 U.S.C. § 706(1). In "determining whether agency action has been unreasonably delayed," courts find "helpful guidance" in the six non-exhaustive factors identified by the D.C. Circuit in *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) ("*TRAC*"). *See Gonzalez v. Cuccinelli*, 985 F.3d 357, 375 (4th Cir. 2021). The *TRAC* factors are:

> (1) the time agencies take to make decisions must be governed by a rule of reason;
>
> (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;
>
> (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;
>
> (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;
>
> (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and
>
> (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

22

*Id.* (quoting *TRAC*, 750 F.2d at 80). Courts often condense the *TRAC* factors into four inquiries. "First, 'is there any rhyme or reason—congressionally prescribed or otherwise—for an agency's delay (factors one and two)?'" *Akter v. Rubio*, 805 F. Supp. 3d 37, 46 (D.D.C. 2025) (quoting *Sawahreh v. U.S. Dep't of State*, 630 F. Supp. 3d 155, 161 (D.D.C. 2022)). "Second, 'what are the consequences of delay if the Court does not compel the agency to act (factors three and five)?'" *Id.* (quoting *Sawahreh*, 630 F. Supp. 3d at 161). "Third, 'how might forcing the agency to act thwart its ability to address other priorities (factor four)?'" *Id.* (quoting *Sawahreh*, 630 F. Supp. 3d at 161). "And last, 'is the delay intentional or due to any impropriety on the part of the agency (factor six)?' *Id.* (quoting *Sawahreh*, 630 F. Supp. 3d at 161).

Here, to the extent that the Court determines that ICE has reconsidered its decision to deny OAG's *Touhy* request in full, it should conclude that Defendants have unreasonably delayed responding to the *Touhy* request. Under factors one and two, Defendants' failure to comply promptly with OAG's subpoena is not "governed by a rule of reason." *See id.* (quoting *TRAC*, 750 F.2d at 80). "In assessing whether an agency follows a rule of reason," courts "evaluate the length of the delay in light of 'the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency.'" *Da Costa v. Immigr. Inv'r Program Off.*, 80 F.4th 330, 340 (D.C. Cir. 2023) (quoting *Mashpee Wampanoag Tribal Council v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003)). "It is reasonable that more complex and substantive agency actions take longer than purely ministerial ones." *Martin v. O'Rourke*, 891 F.3d 1338, 1345–46 (Fed. Cir. 2018). Here, Defendants refused to produce *any* documents in response to OAG's subpoena, even ones that they already produced in the *D.N.N.* litigation—a "purely ministerial" task that would not have been time-consuming or burdensome. *See id.* at 1346. They also offered no explanation for why an entire additional month was needed to determine merely "if [the agency]

23

can implement reasonable parameters to sharing information responsive to [OAG's] *Touhy* request." Email from Rachel Knight, Ex. O to Compl., ECF 1-15, at 3. Defendants' unexplained delay does not reflect the presence of a "rule of reason." *See Gonzalez*, 985 F.3d at 375 (quoting *TRAC*, 750 F.2d at 80).

Under factors three and five, Defendants' delay is "less tolerable" in this case because "human health and welfare are at stake." *See Gonzalez*, 985 F.3d at 375 (quoting *TRAC*, 750 F.2d at 80). OAG is investigating allegations that persons detained at the Fallon Federal Building have been denied adequate food, water, and medical treatment. This Court already has found that "Defendants' failure to attend to the medical needs of detainees poses a substantial risk of serious harm to individuals detained in the Baltimore Hold Rooms." Mem. Op., Ex. K to Compl., ECF 1-11, at 59; *see also id.* at 18 n.21 (noting that "declarants . . . also detail receiving . . . inadequate meals and insufficient food," and that "Defendants do not dispute that only three bottles of water are provided daily"). By impeding OAG's investigation, Defendants are preventing OAG from understanding the full scope of those threats to public health and welfare and meaningfully evaluating potential responses. *See Pub. Citizen Health Research Grp. v. Comm'r, FDA*, 740 F.2d 21, 34 (D.C. Cir. 1984) ("When the public health may be at stake, the agency must move expeditiously to consider and resolve the issues before it."). For the same reasons, "[t]he interests prejudiced by delay are substantial." *See Am. Acad. of Pediatrics v. U.S. FDA*, 330 F. Supp. 3d 657, 666 (D. Mass. 2018). As this Court held in *D.N.N.*, "[t]he unhygienic conditions, lack of sanitary care, and woefully inadequate screening (and treatment) of medical issues pose obvious and serious risks of irreparable harm to [detainees'] physical well-being." Mem. Op., Ex. K to Compl., ECF 1-11, at 63–64. Defendants' failure to respond is preventing OAG from promptly completing its investigation into these serious allegations of unconstitutional treatment.

24

Conversely, under factor four, Defendants cannot show that expediting their response would have a significant "effect . . . on agency activities of a higher or competing priority." *Cf. Gonzalez*, 985 F.3d at 375 (quoting *TRAC*, 750 F.2d at 80). Some—though not all—of the documents sought were already produced to the plaintiffs in the *D.N.N.* lawsuit. Production of those documents, at minimum, "would have no effect on the economy and efficiency of the [agency]'s operations." *See In re Subpoena to NSF OIG*, 2018 WL 5017612, at *3. As for the remaining records, Defendants have not alleged any "resource constraints" or "competing priorities," *Gonzalez*, 985 F.3d at 375, and such allegations would not be credible. Because the One Big Beautiful Bill Act, Pub. L. 119-21, §§ 90003 & 100052, 139 Stat. 358, 388 (July 4, 2025), appropriated ICE an additional $75 billion for use through September 30, 2029, ICE's budget is now larger than that of all other federal law enforcement agencies combined. *See* Bill Chappell, *How ICE grew to be the highest-funded U.S. law enforcement agency*, NPR (Jan. 21, 2026 5:00 AM), https://www.npr.org/2026/01/21/nx-s1-5674887/ice-budget-funding-congress-trump [https://perma.cc/9M2Q-3ALD]. Given how lavishly ICE is currently funded, the Court "cannot rely on the agency's allegations to find as a matter of law that this factor [of resource constraints] necessarily favors the agency." *See Gonzalez*, 985 F.3d at 376.

Finally, while "the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed," *id.* at 375 (quoting *TRAC*, 750 F.2d at 80), this Court is well aware that discovery in *D.N.N.* was contentious and involved accusations that "Defendants ha[d] deliberately sought to withhold material information from Plaintiffs and the Court." *E.g.*, Request for Tel. Conf., *D.N.N.*, No. 1:25-cv-01613-JRR, ECF 158, at 2; *see also* Mem. Op., Ex. K to Compl., ECF 1-11, at 12 n.11 ("Plaintiffs did not seek a ruling as to spoliation of evidence or a related adverse evidentiary inference, because, as Plaintiffs' counsel asserted at

25

the hearing: 'We don't need it.'").  The Court therefore need not presume that Defendants' unexplained delay in responding to OAG's *Touhy* request is benign.  *Cf. United States v. Oregon*, No. 6:25-CV-01666-MTK, 2026 WL 318402, at *11 (D. Or. Feb. 5, 2026) ("The presumption of regularity that has been previously extended to [the United States] that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds."); *Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 90–92 (D.D.C. 2025).

Hence, in the alternative to Counts I and II, Defendants' response to OAG's *Touhy* request has been unreasonably delayed under the APA.  The Court should declare that Defendants' delay in responding violates 5 U.S.C. § 706(1), and order Defendants to respond to OAG's administrative subpoena on an expedited schedule determined by the Court.

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiff's motion should be granted, and the Court should issue the accompanying proposed order.

Dated:  March 26, 2026                    Respectfully submitted,

**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

By: <u>*/s/ Keith M. Jamieson*</u>
Keith M. Jamieson (D. Md. Bar No. 31543)
Yasmin Dagne (D. Md. Bar No. 32016)
Adam Kirschner (D. Md. Bar No. 31767)
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
kjamieson@oag.maryland.gov
(410) 576-6960

*Counsel for the State of Maryland*

26