**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

**STATE OF MARYLAND,**

***Plaintiff*,**

**v.**

**DAVID VENTURELLA,[1] *et al.*,**

***Defendants*.**

**Civil No.: 1:26-cv-01024-JRR**

**MEMORANDUM OPINION**

Pending before the court is the State of Maryland's Motion for Summary Judgment (ECF No. 6) and Defendants' Motion to Dismiss or, in the Alternative, Cross Motion for Summary Judgment (ECF No. 16). The court has reviewed all papers; no hearing is necessary. Local Rule 105.6 (D. Md. 2025). For the reasons set forth below, Defendants' Motion, construed as a motion to dismiss pursuant to Rule 12(b)(1), will be granted, and the State's Motion will be denied as moot.

## I. BACKGROUND

### A. Federal Agency Disclosures of Information

Pursuant to 5 U.S.C. § 301 and following the reasoning of *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), federal agencies promulgate "regulations for . . . the distribution and performance of [their] business, and the custody, use, and preservation of [their] records, papers, and property." 5 U.S.C. § 301. These *Touhy* regulations, as they are known, establish the procedures parties must follow to request agency documents or information. *COMSAT Corp. v. Nat'l Sci. Found.*, 190 F.3d 269, 272 n.3 (4th Cir. 1999). The Department of Homeland Security's ("DHS") *Touhy* regulations, codified at 6 C.F.R. §§ 5.41–5.49, govern responses to

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Madam Clerk shall substitute the following Defendants: David Venturella for Todd Lyons, Senior Official Performing the Duties of the Director, Immigration and Customs Enforcement; and Markwayne Mullin for Kristi Noem, Secretary, U.S. Department of Homeland Security.

"subpoenas, . . . requests for depositions, affidavits, admissions, responses to interrogatories, document production, interviews, or . . . applicable state rules." 6 C.F.R. § 5.41(a)(2). Parties seeking information or documents from DHS must "set forth in writing, and with as much specificity as possible, the nature and relevance of the official information sought," including a description of the documents "or other materials" requested. 6 C.F.R. § 5.45(a). When considering a request or demand for information,

> Department officials and attorneys shall consider, among any other pertinent considerations:
>
> **(1)** Whether such compliance would be unduly burdensome or otherwise inappropriate under the applicable rules of discovery or the rules of procedure governing the case or matter in which the demand arose;
> **(2)** Whether compliance is appropriate under the relevant substantive law concerning privilege or disclosure of information;
> **(3)** The public interest;
> **(4)** The need to conserve the time of Department employees for the conduct of official business;
> **(5)** The need to avoid spending the time and money of the United States for private purposes;
> **(6)** The need to maintain impartiality between private litigants in cases where a substantial government interest is not implicated;
> **(7)** Whether compliance would have an adverse effect on performance by the Department of its mission and duties; and
> **(8)** The need to avoid involving the Department in controversial issues not related to its mission.

6 C.F.R. § 5.48(a).

Further, compliance with information requests "will not ordinarily be authorized" if any of the following circumstances exist:

> **(1)** Compliance would violate a statute or a rule of procedure;
> **(2)** Compliance would violate a specific regulation or Executive order;
> **(3)** Compliance would reveal information properly classified in the interest of national security;
> **(4)** Compliance would reveal confidential commercial or financial information or trade secrets without the owner's consent;
> **(5)** Compliance would reveal the internal deliberative processes of the Executive Branch; or
> **(6)** Compliance would potentially impede or prejudice an on-going law enforcement investigation.

6 C.F.R. § 5.48(b).

**B. Maryland Office of the Attorney General**

Pursuant to Section § 20-1041 of the State Government Article of the Maryland Code, the Maryland Attorney General may investigate and prosecute "any conduct that constitutes a civil rights violation." MD. CODE ANN., STATE GOV'T § 20-1041(a). The Attorney General may not bring a civil rights action against the employees or entities of state or local government, or on behalf of an individual. *Id.* § 1041(b). Section 20-1044 requires the Attorney General to investigate "whether there is reasonable cause to believe that any person committed a civil rights violation" prior to initiating a civil action. *Id.* § 20-1044(a). During an investigation, the Attorney General is permitted to subpoena witnesses, examine them under oath, and "compel production of records, books, papers, contracts, and other documents." *Id.* § 20-1044(b).

Pursuant to § 6-106.1 of the State Government Article, the Attorney General is permitted to investigate and prosecute "any civil or criminal suit or action that is based on the federal government's action or inaction that threatens the public interest and welfare" of Maryland residents within enumerated policy areas, including "protecting the health of the residents of the State," "protecting civil liberties," and "protecting the residents of the State against illegal and unconstitutional federal immigration or travel restrictions." MD. CODE ANN., STATE GOV'T § 6-106.1(b)(1).

**C. The State's Investigation**

This action arises from an investigation initiated in early 2026 by the Maryland Office of the Attorney General ("OAG") into allegations of civil rights violations in the Baltimore Immigration and Customs Enforcement ("ICE") holding facilities ("Hold Rooms") located in the George H. Fallon Federal Building ("Fallon Building"). (ECF No. 1 ¶¶ 23, 26–29.) According to the Complaint, the Fallon Building contains five Hold Rooms with a maximum capacity of 56 individuals. *Id.* ¶ 24. Because the Hold Rooms are "short term" facilities intended to facilitate detention for a maximum of approximately 12 hours, they are not

equipped for basic medical, hygiene, or sleeping needs. *Id.* ¶ 25. As federal immigration enforcement efforts have escalated over the last year, federal officials report that the Hold Rooms' "existing detention capacity" has come under strain. *Id.* ¶ 36.

After becoming aware of a video capturing conditions in the Hold Rooms, OAG launched an investigation to determine whether DHS and ICE "are engaging in a pattern or practice of civil rights violations" by subjecting detainees to conditions including "overcrowding, extended duration of detention, failure to provide medical attention, failure to provide sufficient food and water, failure to provide an adequate sleep environment, failure to provide access to hygienic and sanitary conditions, and failure to provide access to legal counsel." *Id.* ¶¶ 28–30.[2]

As part of its investigation, on January 30, 2026, OAG served an administrative subpoena (the "Subpoena") on "the targets of its investigation—DHS and ICE." *Id.* ¶ 46. (ECF No. 1-13.) The Subpoena was submitted in compliance with DHS disclosure regulations (*i.e.*, *Touhy* regulations). *Id.* ¶ 13; 6 C.F.R. §§ 5.41-5.49. It was accompanied by a "*Touhy* letter" wherein OAG described the "nature and relevance of the information sought" per 6 C.F.R. § 5.45(a). (ECF No. 1 ¶ 15; ECF No. 1-13.) OAG's letter stated that the request for information was issued pursuant to its authority under "sections 20-1041(a) and 6-106.1(b)(1) of the State Government Article of the Annotated Code of Maryland." (ECF No. 1-13 at p. 3.) The Subpoena invoked the Attorney General's authority pursuant to "the provisions of Md. Code Ann. State Gov't[] § 20-1044(b)." *Id.* at 12. Pursuant to its authority "to conduct investigations of potential civil rights violations and actions or inactions by the federal government," *id.* at 5, OAG identified nine categories of information it asserted was relevant to its investigation of

[2] Relevant to OAG's investigation, this court made similar findings in *D.N.N. v. Liggins*, 822 F. Supp. 3d 543 (D. Md. 2026), supporting its grant of a preliminary injunction for a putative class of individuals detained in the same Baltimore ICE holding facility.

"ongoing civil violations related to immigration detention by ICE" in the Hold Rooms. *Id.* at

7. OAG sought the following information for the previous 12-month period:

1. All documents produced in discovery to the Plaintiffs in *D.N.N. et al. v. Baker et al.*, No. 1:25-cv-01613-JRR (D. Md. 2025).

2. All documents related to any report, assessment, or investigation conducted by any officer or agent of the United States, or by any person on behalf of the United States, of the conditions in or operation of the Hold Rooms in the Fallon Federal Building within the last eighteen (18) months.

3. All complaints or grievances or other communications received by any agent, agency, or contractor of the United States within the last twelve (12) months from any person, including Detainees, their counsel or other persons acting on behalf of Detainees, public or elected officials, or the media and any response to complaints, grievances, or report concerning the treatment of Detainees in the Hold Rooms in the Fallon Federal Building or the conditions in the Hold Rooms in the Fallon Federal Building, including but not limited to:
   a. Access to medical care, medications, mental health services, or health services;
   b. Access to counsel or the denial of access to counsel;
   c. Use of force against detainees;
   d. Food, nutrition, and hydration;
   e. Sanitation and access to toilet and running water;
   f. Crowding and access to proper bedding; and
   g. Heating, cooling, or proper ventilation.

4. All documents that relate or refer to injuries, illnesses, or health care needs of Detainees in the Hold Rooms in the Fallon Federal Building within the last twelve (12) months, including but not limited to requests for health care by Detainees or persons requesting on their behalf, reports, complaints or grievances, medical records, investigative reports, or records or logs of transport to a hospital or other medical facility for health care needs.

5. All documents related to the use of force against any Detainee in the Hold Rooms in the Fallon Federal Building in the last twelve (12) months.

6. All contracts for services for Detainees in the Hold Rooms in the Fallon Federal Building that were in effect or entered into in the last twelve (12) months for:
   a. Medical services;
   b. Food;
   c. Bedding or furniture;
   d. Sanitation supplies; and
   e. Heating, cooling, or ventilation.

7. The Detention Log(s) for each Detainee in a Hold Room in the Fallon Federal Building in the last twelve (12) months.

> 8. To the extent not included in the Detention Logs referenced in Request 7 above, the specific Immigration and Nationality Act, 8 U.S.C. § 1101 et seq., provision(s) for the removal and detention, if applicable, of any Detainee in a Hold Room in the Fallon Federal Building in the last twelve (12) months.
>
> 9. The Holding Facility Inspection Logs for U.S. Immigration and Customs Enforcement in the Fallon Federal Building in the last twelve (12) months.

(ECF No. 1-13 at pp. 17–18.)

On February 25, 2026, ICE denied OAG's request "pursuant to the DHS *Touhy* regulations." (ECF No. 1-14 at p. 2.) In its response, ICE listed various bases for the denial, including that some demands for documents "do not adequately describe how the information sought is directly relevant" to OAG's investigation and that some demands "may" implicate privileged information. *Id.* at 3. Chiefly, ICE took the position that most of OAG's requests were "overly broad, unduly burdensome," as well as duplicative because they "likely would be obtainable" from documents ICE had already produced in the ongoing *D.N.N. v. Baker* litigation, in which the State of Maryland has appeared as amicus curiae. *Id.* at 3–6. Indeed, in response to each of the nine requests, ICE asserted the request was "overly broad, unduly burdensome," and "duplicative" based on *D.N.N. v. Baker* discovery. *Id.* In the case of seven of the nine requests, ICE added that disclosure of the requested records "may" violate the Privacy Act, 5 U.S.C. § 552a, or otherwise cause "an unwarranted invasion of privacy." *Id.* Further, in addition to its burden and duplication objections, the agency rejected OAG's request for information about ICE contracts for services with ICE as "lacking in specificity." (ECF No. 1-14 at p. 6.) OAG's request for provisions of the Immigration and Nationality Act ("INA") relevant to the detention and removal of Hold Rooms detainees was rejected as "vague and ambiguous." *Id.*

ICE concluded its Subpoena response by informing OAG that even "assuming that your requests . . . were modified to appropriately narrow and identify the information sought, the

nature of the requests would likely still . . . be unduly burdensome and duplicative given the information being exchanged during the discovery process in [*D.N.N. v. Baker*]." *Id.* at 7.

By letter of February 27, 2026, OAG responded to ICE to "identify deficiencies" in the agency's response. (ECF No. 1-16 at p. 2.) Therein, OAG identified *Touhy* factors it asserted ICE failed to consider. *Id.* at 4. Additionally, OAG challenged ICE's statement that the State of Maryland's status as amicus curiae in the *D.N.N. v. Baker* litigation would afford it access to discovery materials, citing the confidentiality agreement and protective order entered in that case, which restricts nonparty access to discovery. *Id.* at 5. OAG also argued that discovery in another lawsuit is an insufficient substitute for production directly from ICE. *Id.* On March 6, 2026, in response to OAG's deficiency letter, ICE requested additional time "to confer internally to determine if we can implement reasonable parameters to sharing information responsive to your *Touhy* request and administrative subpoena." (ECF No. 1-15 at p. 3.) ICE advised it "should be able to provide a further response by Monday, April 6, 2026." *Id.* In reply, OAG reiterated the "great urgency" of its request, expressing that a "monthlong delay" was not "consistent with [ICE's] *Touhy* obligations." *Id.* at 2. ICE responded confirming only that it would "stay focused on resolving this matter as soon as possible." *Id.*

**D. Procedural Posture**

Following ICE's response to its Subpoena and *Touhy* letter, OAG initiated the instant action with its Complaint (ECF No. 1) against Defendants[3] seeking enforcement of the Subpoena under the Administrative Procedure Act ("APA") on three bases: 1) ICE's refusal to provide the requested information is contrary to law, 5 U.S.C. § 706(2)(A), (D); 2) ICE's refusal is arbitrary and capricious, 5 U.S.C. § 706(2)(A); and 3) ICE's conduct constitutes "agency action unreasonably delayed," 5 U.S.C. § 706(1). (ECF No. 1 ¶¶ 70–98.) Sixteen days later,

[3] As originally filed, the named Defendants were Todd M. Lyons (then Director of ICE), ICE, Kristi Noem (then Secretary of DHS), and DHS. (ECF No. 1.) Following leadership changes, Defendants are now David Venturella (Acting Director of ICE), ICE, Markwayne Mullin (Secretary of DHS), and DHS. (ECF No 21.)

the State moved for Summary Judgment. (ECF No. 6; the "State's Motion.") Defendants then filed a Motion to Dismiss, or in the Alternative, Cross Motion for Summary Judgment (ECF No. 16; the "Defendants' Motion.") The Motions are ripe for ruling.

## II. LEGAL STANDARD[4]

"Rule 12(b)(1) of the Federal Rules of Civil Procedure authorizes dismissal for lack of subject matter jurisdiction." *Barnett v. United States*, 193 F. Supp. 3d 515, 518 (D. Md. 2016). "The plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence." *United States ex rel. Fadlalla v. DynCorp Int'l LLC*, 402 F. Supp. 3d 162, 176 (D. Md. 2019) (citing *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999)). "In determining whether jurisdiction exists, 'the court may look beyond the pleadings and the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue.'" *Id.* (quoting *Khoury v. Meserve*, 268 F. Supp. 2d 600, 606 (D. Md. 2003)).

Subject matter jurisdiction challenges may proceed in two ways: "either a facial challenge, asserting that the allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting 'that the jurisdictional allegations of the complaint [are] not true.'" *Mayor & City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452, 479 (D. Md. 2019) (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)). In a facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns*, 585 F.3d at 192; *see Ministry of Defence of State of Kuwait v. Naffa*, 105 F.4th 154, 159 (4th Cir. 2024) (same). Conversely, in a factual challenge, "the presumption of truthfulness normally accorded a complaint's allegations does not apply, and the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction." *Kerns*, 585 F.3d at

[4] Because the court concludes that the State fails to demonstrate standing, and therefore that the court lacks jurisdiction, it does not reach the parties' remaining arguments per Federal Rules of Civil Procedure 12(b)(6), 12(d), and 56, or regarding APA judicial review. Therefore, the court recites here the legal standard pertaining only to the 12(b)(1) argument.

192. "In that circumstance, the court 'may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" *Trump*, 416 F. Supp. 3d at 479 (quoting *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004)).

Here, Defendants raise a facial subject matter jurisdiction challenge—asserting the State lacks standing because the "[S]ubpoena was legally invalid." (ECF No. 16 at p. 6.)

## III. ANALYSIS

As a threshold matter, the State must plausibly allege it is "legally entitled" to consideration of its Subpoena under DHS *Touhy* regulations, and has sustained harm by the manner of DHS's denial. *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017) (citing *Spokeo v. Robbins*, 578 U.S. 330, 341 (2016)). Although this court's role in reviewing and enforcing administrative subpoenas is limited, that role includes determining whether the agency in question is "authorized to make such investigation." *EEOC v. American & Efird Mills, Inc.,* 964 F.2d 300, 302–303 (4th Cir. 1992).

In its Motion, the State argues that Defendants' denial of OAG's request for information violates the APA. (ECF No. 6-1 at pp. 14–25.) In response (to the Complaint as well as the State's Motion), Defendants mount a facial challenge to the court's subject matter jurisdiction on grounds that the State was not authorized to issue the Subpoena in the first place. (ECF No. 16 at pp. 11 n.2, 14–16.) Specifically, Defendants assert that the statutory basis for the Subpoena (as set forth on the face of the Subpoena) does not authorize OAG to subpoena a federal agency. *Id.* As such, the State lacks standing to complain that ICE refused to comply. The court agrees with Defendants.

As explained in detail below, the statute cited in the Subpoena as the basis for the State's authority in fact does not authorize the State to pursue enforcement action against federal government entities. Therefore, the Subpoena is fatally facially defective and cannot be

enforced by this court. Accordingly, the State cannot plausibly allege a cognizable or redressable injury sufficient to confer standing.[5]

**A. Standing**

The Constitution extends the judicial power of Article III courts to "cases" or "controversies." U.S. CONST. ART. III, § 2, cl. 1. The doctrine of standing, among others, "implements" this limit. *Carney v. Adams*, 592 U.S. 53, 58 (2020). In particular, this doctrine requires "a plaintiff to have a 'personal stake' . . . in the suit he brings." *Holmes v. Elephant Ins. Co.*, 156 F.4th 413, 420 (4th Cir. 2025) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)).

To establish standing:

> First, the plaintiff must have suffered an injury in fact that is both concrete and particularized and actual or imminent, not conjectural or hypothetical. Second, the plaintiff's injury must be fairly traceable to the challenged action of the defendant, meaning that there must be a causal connection between the injury and the conduct complained of. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Dep't. of Educ v. Brown*, 600 U.S. 551, 561 (2023) (citations omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

This threshold is "no troublesome hurdle" and can "be cleared with the most whimsical attempts on the way to the merits." *State of Maryland v. United States Dep't of Agric.*, 151 F.4th 197, 208 (4th Cir. 2025) (quoting *United States v. Texas*, 599 U.S. 670, 675 (2023)). But failure to clear the hurdle on all three prongs places a claim squarely outside the federal court's Article III power. *Id.* The party invoking the federal court's jurisdiction bears the burden of

[5] The State's Complaint plainly identifies DHS and ICE as the targets of its investigation and does not plausibly allege that OAG was additionally or alternatively investigating private parties. (ECF No. 1 ¶¶ 2, 30, 46.) This disqualifies Plaintiff's contention that the Subpoena was instead a third-party subpoena. (ECF No. 17 at pp. 17–21.) For the foregoing reasons, and to avoid the perils of analyzing matters not before the court (*i.e.*, advance rulings), the court declines to engage in legal analysis of that subject.

establishing each element of standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.

Regarding an injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). "'Concrete' is not, however, necessarily synonymous with 'tangible.'" *Id.* at 340. Relevant here, "[a]n 'informational injury' is a type of intangible injury that can constitute an Article III injury in fact." *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017) (quoting *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998)). Informational injury qualifies as an injury in fact only if the plaintiff can allege "a 'real' harm with an adverse effect." *United States Dep't of Agric.*, 151 F.4th at 208 (quoting *Dreher*, 856 F.3d at 345). A claim that "the federal government withheld information that the State[] had a statutory right to receive" is "a quintessential informational injury." *Id.*

But a "statutory violation alone" is insufficient to confer standing. *Dreher*, 856 F.3d at 345 (citing *Spokeo*, 578 U.S. at 341). "Rather, a constitutionally cognizable informational injury requires that a [plaintiff] lack access to information to which [it] is legally entitled *and* that the denial of that information creates a 'real' harm with an adverse effect." *Id.* (emphasis in original) (quoting *Spokeo*, 578 U.S. at 340). The precise issue is whether the plaintiff can ground the claimed injury in a right conferred by statute or rule (whether to substance or process), not simply a general desire for statutory compliance. This requirement is linked to the redressability prong of the standing doctrine, as the absence or infeasibility of a legal entitlement inhibits the court's ability to order relief. *See United States Dept. of Agric.*, 151 F.4th at 212 (discussing "connection between the alleged injury and the judicial relief requested"); *see also Lawyers' Comm'n for 9/11 Inquiry, Inc. v. Wray*, 424 F. Supp. 3d 26, 34

(D.D.C. 2020) ("It must be likely, as opposed to merely speculative, that a favorable decision will provide redress.")[6]

In the instant case, the State alleges Defendants' denial of its Subpoena request for information about the Baltimore Hold Rooms violates the agency's *Touhy* regulations and the APA. (ECF No. 1 ¶¶ 63–68.) By way of remedy, the State asks this court to order DHS to properly apply its *Touhy* regulations to the State's Subpoena. *Id.* ¶¶ 70–98; 5 U.S.C. § 706(2). Defendants counter that the State fails to plead an adequate informational injury given the Subpoena's defectiveness. (ECF No. 16 at p. 15.)

As described below, because the State invokes MD. CODE. ANN., STATE GOV'T § 20-1044(b) as the authority for the Subpoena,[7] any legal entitlement or right must flow from the authority granted under that provision and related statutory scheme. (ECF No. 1-13 at p. 12.) Redressability of the State's alleged injury also depends on the existence of any legal entitlement(s). *United States Dep't of Agric.*, 151 F.4th at 212. In order to assess the scope of any such entitlement, the court turns to the statute itself.

**B. Scope of the State's Subpoena Authority**

The State's assertion that it has been denied information to which it is legally entitled is premised on the authority conferred by § 20-1044(b) to subpoena a federal agency as part of

[6] The existence of "legal rights or consequences" is also required for proper APA judicial review. *COMSAT Corp. v. Nat'l Sci. Found.*, 190 F.3d 269, 274 (4th Cir. 1999) (noting that in order for agency action to be "final" and permit APA review, it must "signal[] the consummation of an agency's decisionmaking process *and* give[] rise to legal rights or consequences") (emphasis in original).

[7] As Defendants note, the Subpoena invokes only MD. CODE ANN. STATE GOV'T § 20-1044(b) as authority to demand documents from DHS. (ECF No. 1-13 at 12; ECF No. 16 at p. 11 n.2). In its *Touhy* letter, the State additionally invokes § 6-106.1(b)(1) as grounds for the Subpoena (and OAG's associated investigatory authority). (ECF No. 1-13 at p. 3; ECF No. 1 at ¶ 29.) Defendants argue that by omitting the latter statute from the Subpoena, the only legally operative statute with respect to the State's demand for information is § 20-1044(b). The court agrees. The Subpoena is the legal instrument the State requests the court enforce; as such, the court's enforcement powers are coterminous with the authority on which the Subpoena is premised. Said another way, were the court to enforce the Subpoena on legal grounds other than those expressly set forth therein and, in doing so, find Defendants at odds with their APA obligations, the court would appear to impose on federal agencies an obligation that rests squarely on the State's shoulders and to pronounce a new basis of APA violation for failure to investigate whether the State has authority to issue its Subpoena on any basis not set forth therein. That is obviously not the law. Given that the State did not contest this defense argument and subsequently presented briefing only with respect to § 20-1044(b) and its associated provisions, *see* ECF Nos. 17, 24, the State effectively concedes the point. *See Stenlund v. Marriott Int'l Inc.*, 172 F. Supp. 3d 874, 887 (D. Md. 2016).

an investigation. (ECF No. 17 at pp. 22–26.) When interpreting a state statute, federal courts must "apply the statutory construction rules applied by the state's highest court." *Fusaro v. Howard*, 19 F.4th 357, 371 n.21 (4th Cir. 2021). The "cardinal rule" of statutory interpretation under Maryland law is to "ascertain and effectuate the intent of the legislature." *Moore v. State*, 388 Md. 446, 452 (2005). To that end, Maryland courts begin with the plain language of the statute. *Mayor of Oakland v. Mayor of Mountain Lake Park*, 392 Md. 301, 316 (2006). If the plain language offers multiple plausible meanings, the court "consider[s] the meaning of the language of the statute and how that language relates to the overall meaning, setting, and purpose of the [statute]." *Deville v. State*, 383 Md. 217, 33 (2004). But "[c]onsideration of the statutory text in context is [the court's] primary guide." *In re J.C.N.*, 460 Md. 371, 391 (2018). Statutory interpretive analysis thus "avoid[s] a construction of the statute that is unreasonable, illogical, or inconsistent with common sense." *Gwin v. MVA,* 385 Md. 440, 462 (2005).

As explained, § 20-1041 of the State Government Article authorizes the Attorney General to "investigate, prosecute, and remediate . . . any conduct that constitutes a civil rights violation." MD. CODE ANN., STATE GOV'T § 20-1041(a). However, the Attorney General may not bring a civil rights action on behalf of an individual or against "any unit of State or local government." *Id.* at § 20-1041(b). Further, § 20-1044 requires the Attorney General to investigate whether there is "reasonable cause to believe that any person committed a civil rights violation" prior to initiating an enforcement action. *Id.* § 20-1044(a). The Attorney General may subpoena witnesses or compel production of documents as part of that investigation. *Id.* at § 20-1044(b). And the Attorney General may initiate an action if there is "reasonable cause to believe that a person is engaged in" activity prohibited by state or federal law, or state or federal constitutional provisions. *Id.* § 20-1042(a).

The State emphasizes the "any conduct" language of § 20-1041, arguing that the legislature's use of such broad language connotes broad investigative authority including the

power to subpoena federal agencies. (ECF No. 17 at p. 22.) The State additionally highlights that while § 20-1041(b) prohibits the Attorney General from bringing civil actions against state and local government entities (and their employees), it lacks a similar carveout for the federal government. *Id.* at pp. 22–23. Accordingly, the State argues, the legislature could have insulated the federal government from the Attorney General's investigative power if it wanted to, and it chose not to do so. *Id.* at p. 23.

Defendants direct the court to § 20-1044, which permits the Attorney General to initiate an action upon reasonable cause to believe "any person" is engaged in violative conduct. (ECF No. 21 at p. 11.) Read in context, Defendants argue, the language of § 20-1044 evinces the legislature's intent to permit actions in response to "any conduct," but only against private parties. *Id.* Defendants posit that this plainly does not include the federal government, as the federal government does not qualify as a "person." *Id.* And, Defendants reason, unless there is clear language placing the federal government within the scope of the Attorney General's authority under this statute, there is no basis on which to conclude that the Attorney General's power extends that far. *Id.* at pp. 12–13. Defendants also note that the legislature expressly granted OAG the authority to respond to the actions of federal entities in other statutes and omitted such a grant of authority here. *Id.* at pp. 14–15. In other words, if the legislature intended or wanted to grant such authority in this context, it obviously knows how to do it.

In alignment with the statutory interpretation principles set out above, the court reads the statutory scheme as a whole. *In re J.C.N.*, 460 Md. at 391. At the outset, the language of § 20-1041 does appear to confer broad enforcement authority on the Attorney General given its extension to "any conduct." MD. CODE ANN., STATE GOV'T § 20-1041(a). Section 20-1044, the only provision actually cited in the Subpoena, confers investigative authority but aims the Attorney General's enforcement power at "any person." *Id.* § 20-1044(a). The term "persons," as defined by the General Assembly, does not include the federal government or its component

entities. *Id*. § 1-101(d) (defining "person" as "an individual, receiver, trustee, guardian, personal representative, fiduciary, or representative of any kind and any partnership, firm, association, corporation, or other entity"). And, as a general matter, courts do not presume the federal government is included within the meaning of "person" absent "affirmative language to the contrary." *Peck v. U.S. Dept. Lab., Admin. Rev. Bd.*, 996 F.3d 224, 231–32 (4th Cir. 2021) (quoting *Return Mail, Inc. v. U.S. Postal Serv.*, 587 U.S. 618, 626 (2019)). The State's *expresio unius* argument is therefore unpersuasive. (ECF No. 17 at pp. 16–17.)

As "person" does not include federal government entities, reading § 20-1044 and § 20-1041 together indicates that while the legislature intended to confer enforcement (and related investigative) authority to the Attorney General on a wide scope of conduct, the statutory scheme appears deliberately aimed at the potentially violative conduct of "person[s]."[8] *Id.* So while the universe of violative conduct is broad, the statutory scheme focuses on violative conduct by "person[s]" rather than all potential actors. *Id.*

Further, as noted, the General Assembly has expressly authorized the Attorney General to initiate enforcement actions related to federal government action or inaction in other statutory schemes. *See, e.g.*, MD. CODE. ANN., STATE GOV'T § 6-106.1(b)(1). Accordingly, the court is not persuaded that the federal government falls within the Attorney General's enforcement power simply because the legislature did not explicitly exclude it under § 20-1041(b).

[8] Both the State and Defendants discuss the legislative history associated with this statutory scheme. The State cites a letter authored by the Attorney General discussing the statutory text and suggesting the carveouts under § 20-1041(b) were intended to prevent potential conflicts of interest with state and local government units. (ECF No. 17 at pp. 24–25.) The State cites this letter in support of its argument that the legislature's decision not to prohibit actions against the federal government should indicate that OAG is permitted to initiative civil investigations and enforcement actions against the federal government. *Id.* Defendant cites OAG's testimony on the enacting legislation, which characterizes the bill as intended to authorize enforcement against private actors. (ECF No. 16 at p. 18.) While statutory interpretation may involve consideration of legislative history to firm up textual frailties or resolve ambiguities, the text at issue here is neither ambiguous nor unclear.

**C. Third Party Subpoena Power**

Adopting, though still disputing, this reading of the statute, the State maintains that subpoenas issued by OAG pursuant to § 20-1044(b) may be directed at the federal government in the form of third-party subpoenas as part of OAG's investigation of private contractors involved with operation of the Baltimore Hold Rooms. (ECF No. 17 at pp. 5–9.) Defendants counter by noting that neither the Subpoena nor the State's Complaint raises this theory, and therefore the argument is not properly before the court. (ECF No. 21 at pp. 11–12.)

This court has previously held that "[a] plaintiff is not permitted to amend its complaint by supplying new factual allegations in a brief in opposition to a defendant's motion to dismiss." *Bindagraphics, Inc. v. Fox Group, Inc.*, 377 F. Supp. 565, 577 (D. Md. 2019). In other words, a plaintiff may not employ responsive briefing to fix or raise new claims not grounded in the allegations of the plaintiff's complaint. *See, e.g.*, *Mathis v. McDonough*, No. ELH–13–2597, 2014 WL 3894133, at *25 (D. Md. Aug. 7, 2014) (disallowing plaintiff from effectively attempting to amend complaint by alleging recovery theory for the first time in responsive brief). Relatedly, a plaintiff also may not advance legal theories by way of responsive briefing in contradiction of facts alleged in the complaint. *See Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (finding "procedurally deficient" plaintiff's assertion of legal theories through responsive brief in contradiction of complaint factual allegations).

Here, the State's Complaint specifically (and only) identifies DHS and ICE as the targets of its investigation, stating at the outset that OAG is investigating "whether ICE's conduct violated federal civil rights laws." (ECF No. 1 ¶ 2.) The State maintains this point throughout its Complaint. *See id.* ¶ 30 ("OAG is investigating whether DHS and ICE are engaging in a pattern or practice of civil rights violations . . . ."); ¶ 44 (noting that OAG "has an interest in . . . ensur[ing] Defendants are complying" with relevant law, "even when ICE is

not under court order to do so"); ¶ 46 ("OAG sent an administrative subpoena for documents to the targets of its investigation—DHS and ICE."); and ¶ 55 (OAG seeks "evidence of what ICE knew of conditions" in the Hold Rooms).

The State maintains it has "indeed alleged that private contractors are involved," directing the court to paragraph 33 of its Complaint. (ECF No. 17 at p. 8.)[9] There, the State alleges:

> In reported whistleblower allegations, a former worker at the ICE Baltimore Field Office confirmed detained individuals' accounts of conditions in the hold rooms, describing blankets "covered in feces, lice, urine, and throw up;" an incident in which a detained individual who had returned from the hospital was placed in a restraint chair; and the field office's failure to provide menstruating women hygiene products. Eric Flack & Ruth Morton, Former ICE Facility Worker 'saw people laying in feces' at Baltimore Detention Center, WUSA9 (Feb. 6, 2026, 7:52 PM), https://www.wusa9.com/article/news/investigations/ice-detention-facility-overcrowdingbaltimore-whistleblower-dhs-unsanitary-trump/65-03dda8d7-49a9-4caf-b001-db5e12a04158 (last updated Feb. 7, 2026, 11:59 AM) [https://perma.cc/T6CU-47J2].

(ECF No. 1 at ¶ 33.) The State additionally asserts in its Opposition that its investigation has yielded evidence that conditions in the Hold Rooms are "attributable to" a private contractor, and it is investigating that contractor's conduct. (ECF No. 17 at p. 13.) The State argues these references implicate private contractors. *Id.* That may well be the case, but reference to the whistleblower report is offered as support for the State's "interest in documenting and assessing past civil rights violations to ensure that [DHS and ICE] are complying with civil rights law" and to illustrate the legitimacy of the State's inquiry and investigation. (ECF No. 1 ¶ 44.) The State puts too much stock in its oblique pleading reference to a former worker. (ECF No. 17

---

[9] The State also emphasizes the language in its Subpoena (ECF No. 1-13), which requests, among other items, information related to "contracts for services" associated with the Hold Rooms as well as information related to the conduct of "any officer or agent" and relevant communications received by "any agent, agency, or contractor of the United States." (ECF No. 17 at pp. 10–11, quoting ECF No. 1-13 at pp. 17–18.) Because this language is typical of legal documents of this nature, and appears nowhere in the Complaint itself, the court is not persuaded that a pat reference overcomes the statutory limits and analysis set forth above.

at p. 13.) The Complaint's allegations and prayer for relief are plainly directed at possible civil rights violations committed by DHS and ICE. (ECF No. 1 ¶¶ 2, 30, 44, 46, 45.) Even affording the Complaint the benefit of reasonable inferences, an isolated reference to a report of "former worker" at most bolsters the State's interest in investigating the federal government; it does not itself suffice to identify a separate target of the State's investigation and Subpoena. *See, e.g.*, *id.* ¶¶ 32–33 (alleging detainees were "denied dialysis," "denied medication," provided inedible food, and subjected to unsanitary conditions).

In summary, the State's assertion that private contractors are targets of its investigation, either in addition to or in place of DHS and ICE, is at odds with the posture and substance of its Complaint (and the Subpoena). The State's Opposition marks the first time (known to this court) that the State asserts an affirmative, express connection between the suspected civil rights violations and private contractors; or that its investigation has them in its crosshairs. (ECF No. 17 at p. 15.) So, while the positions the State takes in its responsive briefing may be "substantially valid," they are procedurally incompetent to establishing subject matter jurisdiction. *Zachair*, 965 F. Supp. at 748 n.8; *see also* footnote 5, *supra*.

**D. Informational Injury**

The defectiveness of the Subpoena is dispositive to the court's subject matter jurisdiction.[10] As explained, the State bears the burden of establishing standing. *Lujan*, 504 U.S. at 561. In order to plausibly allege an injury in fact, here an informational injury, the State must plausibly allege that DHS's actions constitute a "'real' harm with an adverse effect." *United States Dep't of Agric.*, 151 F.4th at 208 (quoting *Dreher*, 856 F.3d at 345). Relatedly, the State must plausibly allege redressability; that there exists a corresponding judicial remedy. *Id.* at 212. The State alleges that by denying its request for information without properly

[10] The issue of standing informs the availability of APA review, because in order to constitute a "final agency action," an action must give rise to "legal rights and consequences." *COMSAT Corp. v. Nat'l Sci. Found.*, 190 F.3d 269, 272 n.3 (4th Cir. 1999).

applying the governing *Touhy* regulations, 6 C.F.R. § 5.41-5.49, DHS denied OAG its statutory right to multi-factor consideration of its Subpoena. (ECF No. 1 ¶¶ 32–45.) *Dreher*, 856 F.3d at 345.

The State, however, issued the Subpoena to a federal agency under authority of a Maryland statute that does not authorize it to do so as a matter of law. The Subpoena is therefore issued outside the OAG's legal authority pursuant to MD. CODE ANN., STAT GOV'T § 20-1044(b) and related provisions. Pursuant to that particular provision of the Maryland Code, OAG has no cognizable right to the information requested; there is no "actual harm." *United States Dept. of Agric.*, 151 F.4th at 208 (citing *Dreher*, 856 F.3d at 345).[11]

Defendants' facial challenge to this court's subject matter jurisdiction prevails.

## IV. CONCLUSION

For the reasons set forth herein, by separate order, Defendants' Motion to Dismiss (ECF No. 16) shall be granted,[12] and the State's Motion for Summary Judgment (ECF No. 6) shall be denied as moot.

October 15, 2026

/S/
Julie R. Rubin
United States District Judge

---

[11] Even if the State could, despite the invalidity of the Subpoena, plausibly allege an injury in fact, it cannot plausibly allege redressability. This court has no authority to enforce a Subpoena issued under ineffectual legal authority, and therefore cannot properly confer a remedy. *State of Maryland v. United States Dep't of Agric.*, 151 F.4th 197, 208 (4th Cir. 2025) (citing *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017)). Further, because the absence of a legal entitlement renders the agency action nonfinal (as DHS's denial does not give rise to legal rights or consequences), judicial review under the APA is inappropriate. *COMSAT Corp.*, 190 F.3d at 274.

[12] Dismissal for lack of subject matter jurisdiction shall be without prejudice. *See S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 185 (4th Cir. 2013) ("A dismissal for lack of standing—or any other defect in subject matter jurisdiction—must be one without prejudice, because a court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits.").